SOMMERVILLE, ADMINISTRATOR, RESPONDENT, *v.* GREEN-
HOOD, APPELLANT.

(No. 4,917.)

(Submitted October 20, 1922. Decided November 22, 1922.)

[210 Pac. 1048.]

*Conversion—Insane    Persons—Delirium—Presumptions—Rati-
fication—Evidence—Sufficiency.*

Insane Persons—Presumptions—Burden of Proof.
    1. The presumption is that one, who claims to have been injured by transactions had with him at a time when he was not mentally competent, was of sound mind at the time and that he comprehended and knew the nature and consequences of his acts, and the burden of showing incompetency was upon him by a preponderance of the evidence.

Same—Ratification of Acts upon Regaining Mental Competency.
    2. Where plaintiff in an action for conversion, claiming that a transfer of his personal property to a corporation and the organization of the corporation of which he became an officer were invalid because of his mental incompetency at the time, after re-

gaining his mental poise ratified the transactions had, he was bound thereby.

Same—Delirium—Idea of Continuity Excluded—Presumptions.
   3. Since delirium is a disordered state of the mental faculties, more or less temporary, the idea of continuity is excluded, and a person's sanity, when not in delirium, will be presumed.

Same—Delirium—Presumptions.
   4. Under the above rule (par. 3), held that the fact that plaintiff, as to whose mental condition prior to his entering a hospital there was no question, while there was at times delirious, raised no presumption that he was not mentally competent after he returned to his home and when he ratified his acts done at the hospital.

Same—Opinion of Lay Witness—Insufficiency.
   5. The opinion of a lay witness that a person is incompetent, where the reasons for the opinion are unsatisfactory, cannot be considered such substantial evidence as will warrant the submission of the question of his incompetency to a jury, in face of positive and affirmative acts and conduct on his part clearly indicating mental capacity.

Trial—Party Bound by Testimony of His Witness.
   6. A party is bound by the testimony of his own witness.

Insane Persons—Ratification of Acts After Regaining Mental Competency—Evidence.
   7. *Held,* upon a review of the evidence, that even though conceding that plaintiff at the time the transactions were had was mentally incompetent (a question not passed upon), he ratified them at a time when he was competent and was therefore bound thereby.

*Appeals from District Court, Missoula County; Theo. Lentz, Judge.*

ACTION in conversion by W. H. Yerrick against Henry Greenhood and others. From an adverse judgment and from an order denying his motion for new trial, the named defendant appeals. Upon suggestion of the death of plaintiff after appeal, R. S. Sommerville, his administrator, was substituted as respondent. Reversed, with directions to dismiss the action.

*Messrs. Hall & Pope* and *Mr. Thomas N. Marlowe,* for Appellant, submitted a brief; *Mr. Walter L. Pope* and *Mr. Marlowe* argued the cause orally.

---

   4. Capacity to make a contract as affected by mental condition, see note in 3 **L. R. A.** (n. s.) 174.
   5. Opinion evidence by nonexpert as to the contractual or testamentary capacity of another, see note in 4 **Ann. Cas.** 888, 37 **L. R. A.** (n. s.) 591.

*Messrs. Russell, Madeen & Clarke,* for Respondent, submitted a brief; *Mr. Charles A. Russell* argued the cause orally.

MR. JUSTICE FARR delivered the opinion of the court.

This is an action for damages for conversion of a stock of wines, liquors and cigars, furniture and fixtures of a wholesale and retail liquor business in the city of Missoula. William Steinbrenner, Henry Greenhood and F. H. Elmore were made parties defendant at the time of the commencement of the action, and later the First National Bank of Missoula was also made a party defendant.

After issue joined a trial was had in December, 1919, resulting in a judgment of nonsuit as to the defendants Steinbrenner, Elmore and the First National Bank, and a mistrial by reason of the disagreement of the jury as to the defendant Greenhood. The second trial was had in June, 1920, resulting in a verdict for the plaintiff, Yerrick, and against the defendant Greenhood in the sum of $8,959.67 and interest, upon which judgment was rendered for principal and interest in the sum of $13,190.57, and for costs of suit in the sum of $685.84. Defendant Greenhood appeals from the judgment and from an order denying his motion for a new trial. Since the appeal has been perfected the respondent W. H. Yerrick has died, and his administrator has been substituted as respondent.

The amended complaint contains the usual allegations common to an action in conversion. The separate answer of the defendant Greenhood, after denying the conversion, alleges, in substance and effect, that in the month of July, 1914, plaintiff, being seriously sick, was confined in the St. Patrick's Hospital in the city of Missoula; that he was deeply involved financially and unable to pay his obligations, and in order to bring about an extension and to prevent his business from being sold out, and the forfeiting and cancellation of his license as a liquor dealer, in the months of July and August, 1914, he caused to be incorporated under the laws of the state of Montana the "Yerrick Liquor Company," and the defendants

William Steinbrenner and Henry Greenhood were solicited to act with him as incorporators and directors thereof; that plaintiff, through his attorneys, prepared articles of incorporation for incorporating the Yerrick Liquor Company, and signed and acknowledged the same on the thirty-first day of July, 1914, and caused the same to be filed in the office of the county clerk and recorder of Missoula county, Montana, on the eighth day of August, 1914, and later caused the same to be filed with the secretary of state; that plaintiff immediately after said incorporation, for a valuable consideration, sold, transferred, and delivered to the Yerrick Liquor Company his entire stock of goods, wares and merchandise, and the Yerrick Liquor Company thereupon assumed the outstanding obligations, liabilities, and indebtedness of W. H. Yerrick personally, and proceeded to operate the business which had theretofore been owned and conducted by Yerrick as his individual business; that thereafter it was discovered that the corporation could not be operated at a profit so as to pay off its indebtedness, and thereupon defendants William Steinbrenner and Henry Greenhood resigned as directors, and the plaintiff caused to be elected in their place and stead Eddie Randall and Bert Breeding; that in the meantime plaintiff, Yerrick, was restored to his health and returned to his home and personally assumed the management and conduct of the Yerrick Liquor Company, and ran the same as a one-man corporation; that thereafter, to-wit, on the eighteenth day of January, 1915, at a meeting of the directors of the corporation, at which meeting Yerrick acted as president, and Bert Breeding acted as secretary, by resolution passed by the vote of all the directors, there was authorized a general deed of assignment of all the company's property to one Louis Schramm, for the benefit of the creditors of the company, by reason of the insolvency of the corporation, pursuant to which, on the nineteenth day of January, 1915, the corporation made, executed, and delivered a general deed of assignment to Louis Schramm; that said trust was accepted by Schramm, and the assignment was filed in the office of the county clerk

and recorder of Missoula county on January 19, 1915; that thereafter, and on the twenty-first day of January, 1915, plaintiff, Yerrick, as president of the Yerrick Liquor Company, and for and in its behalf, made, verified and caused to be filed an inventory and appraisement, in which were set out all the creditors of the Yerrick Liquor Company and an inventory and appraisement of all the property of the corporation; that the assignee thereupon entered upon the discharge of his duties and took full possession and control of the property, converted the same into money, and paid to the sundry creditors of the corporation, which included all the personal creditors of Yerrick, out of the proceeds realized from the sale of the property, thirty-two and one-half per cent of their several claims; that the property claimed by the plaintiff to have been converted by the defendant to his damage was the same property which was sold to the Yerrick Liquor Company; that all acts and things done by the Yerrick Liquor Company during the time that Greenhood was a director of the same were done with the full knowledge, consent, and approval of Yerrick and at his instance and request and for his use and benefit; and that Greenhood derived no profit whatever from said transactions or any of the same, and never asked or received any compensation for any service performed by him while he was such director, and all things done by him were for the purpose of assisting W. H. Yerrick.

The reply to the separate answer of the defendant Greenhood alleges, in substance and effect, that at all times in the answer mentioned the plaintiff was ill, sick, diseased and disabled in body and mind, nigh unto death, and confined in St. Patrick's Hospital, or at his rooms at Missoula, under the constant care of a physician and nurses, and by reason of his illness and the mental pain and suffering then undergone by him he was during all of said times, and particularly at the times alleged in the answer and at the time of the execution and filing of the articles of incorporation and execution

of bill of sale, delirious, out of his mind, and totally unable to know or understand or appreciate the effect, purpose, or consequence of any matters transpiring before him; that none of the matters and things and alleged transactions were done or performed by plaintiff or by his authority or with his knowledge or consent; and that the alleged acts and transactions were not the acts of plaintiff.

There is much contradiction in the testimony, but an endeavor will be made to state in a general way some of the principal facts of the several transactions surrounding Yerrick and his business affairs so far as they may be involved in this suit, from the time he entered the hospital until the commencement of the action, so far as possible, basing the statement either upon those things which may be considered as conceded or proven, and, as to those matters concerning which the testimony is in conflict, to state wherein there is contradiction. The record is voluminous, consisting of 837 pages of printed matter, and the evidence was not put in with much regard to logical sequence of events, making an accurate statement of the facts most difficult.

The plaintiff, a man seventy years of age and in poor health, for a considerable period of time prior to and on the first day of July, 1914, owned and was engaged in the wholesale and retail liquor business in the city of Missoula, in a building leased from one William H. Houston. The retail part of the business, the saloon, was conducted on the first floor, and the stock of goods from which the plaintiff sold at wholesale, was kept in the basement. On the second floor the plaintiff conducted a rooming-house, and he personally occupied one of the rooms as sleeping quarters and as a sort of a private office. He kept some of his business papers in this room and some in the safe in the front part of the saloon. An inventory was taken of his stock of wines, liquors, cigars, furniture and fixtures, commencing on January 1, and concluding about January 10, 1914, by an ac-

countant, A. L. Davis, who also, from the time of its comple-
tion to June 14, 1914, kept the plaintiff's books of account.

On July 1, 1914, plaintiff entered St. Patrick's Hospital
as a patient, where he remained continuously until November
20, 1914, much of the time being seriously ill, and some of
the time delirious and unable to transact business. At the
time he entered the hospital he had in his employ two
bartenders, Eddie Randall and Bert Breeding. His room-
ing-house portion of the business was conducted by one Eva
Randall, the wife of Eddie Randall, one of his bartenders.
It does not appear that any particular person was left in
charge of any part of his business. He owed some debts, the
exact amount not being shown; one item of indebtedness being
for rent due William H. Houston, owner of the building in
which he conducted his business. He was considerably behind
in his rent. He was also indebted to the First National Bank
of Missoula, with which bank he was doing his banking busi-
ness, on a past-due note. Prior to and at the time plaintiff
went to the hospital, Mr. Houston became concerned about
the payment of his rent and made frequent demands on
plaintiff for payment.

Mr. F. R. Elmore, vice-president of the First National
Bank, called on the plaintiff at the hospital on a number
of occasions—he says fifteen or twenty different times—be-
cause of friendship and on account of business matters, par-
ticularly as concerned the plaintiff's indebtedness to Houston
and the past-due note to the bank. Elmore says plaintiff
sent for him on several occasions and stated that Houston
was after him so much to pay rent that he had him all
worked up and nervous, and that he could not get well if
Houston was allowed to come up there and persist in bother-
ing him. It appears that Houston wanted Yerrick to trans-
fer the liquor business to him because of fear that it would
be taken away from Yerrick on account of Yerrick having
been convicted of crime in the federal court. Elmore con-
ceived the idea, as he says, that if a corporation was formed,
the license could be transferred to it, the business conducted

in the name of the corporation, and thereby Yerrick, Houston and the other creditors be protected. He suggested this to Yerrick, explaining that Yerrick would still possess his business and that "he would own the entire stock." Elmore then says that, at Yerrick's request, he sent for Mr. Harry H. Parsons, an attorney at Missoula, to prepare the papers for incorporating.

Mr. Parsons testified that he had been attorney for Yerrick in several matters covering a considerable period of time, and was then representing him in an endeavor to obtain a pardon for the offense of which Yerrick had been convicted in the federal court, and because of which Yerrick was fearing a jail sentence; that he called on Yerrick at the hospital frequently, and there was talk back and forth between Elmore, Houston, Yerrick and Parsons as to Yerrick's business affairs in an endeavor to provide a method of securing the creditors in the event of Yerrick's death or of any endeavor to take his liquor license from him. All witnesses agree that the belief that Yerrick might not recover was not mentioned to him. The doctor who treated him while he was in the hospital testified that there was a considerable period of time during which he was not expected to make a recovery. Parsons further testified that, in response to a call sent to him by Yerrick, or at his request, while he (Parsons) was on a fishing trip, he returned, and, after conferring with Yerrick, Elmore and Houston, the articles of incorporation were prepared by him. He says: "Mr. Yerrick was to own the corporation absolutely and entirely. Of course, the articles of incorporation gave each one share, but that was done so that they could become directors."

The articles of incorporation, which purport to have been signed on July 31, recite that the amount of stock actually subscribed was three shares, one share, of the par value of $100, by each of the three incorporators, Yerrick, Greenhood, and Steinbrenner. The incorporation papers were taken by Mr. Parsons to the hospital for Mr. Yerrick to sign, there

being present at the time Parsons, Elmore, Steinbrenner, Yerrick and Greenhood, and it is testified that when they first went in, one of the sisters and a nurse were also present.

Steinbrenner and Greenhood were first spoken to about going into the corporation by Elmore. Elmore testified that Yerrick was advised that it took three persons to incorporate, that Yerrick wanted Elmore as one, but, by reason of being in the banking business, he refused to act, and that Yerrick then suggested Steinbrenner and Greenhood. It is testified to that at the time the articles of incorporation were signed Yerrick asked Greenhood to check up the bartenders and keep tab on the cash receipts, pay the bills, and check the register, and that the bartenders, Eddie Randall and Bert Breeding, be retained; that it was understood that Greenhood each morning leave some change in the register and call every night and check the money that had been taken in during the day. Greenhood did thereafter look after the business in a general way. He testified that he merely checked up the cash receipts; that he did not handle the cash register or take any money out of it; that the bartenders put the money in the safe in the office in the front of the building; that the safe was unlocked; that the bartenders had access thereto and that he had no key to the building; that he made deposits in the bank and paid running expenses and some of the bills.

It does not appear that there was any formal meeting held for the purpose of electing officers of the corporation. It appeared to have been talked over and understood that Yerrick was to act as president and Greenhood as secretary. Either at the time of the signing of the articles of incorporation or shortly afterwards, a bill of sale was signed by Yerrick whereby he purported to convey to the corporation all of the liquor stock and the furniture and fixtures. Yerrick's signature thereto was by mark, witnessed by F. H. Elmore and Harry H. Parsons. The instrument purports to be dated the twenty-seventh day of July, and, if executed on

the day it bears date, it was executed four days prior to the articles of incorporation, provided likewise that the articles of incorporation were signed and acknowledgment made on the day it purports to have been signed and acknowledged. The evidence is somewhat in conflict as to the time these various instruments were signed and executed.

There was an assignment of the liquor license put in evidence, purporting to assign it to the Yerrick Liquor Company, the assignment being dated July 23, 1914, eight days prior to the date on the articles of incorporation. Yerrick's name thereto is by mark, witnessed by F. C. Webster and A. N. Ensign, the former having acted as Yerrick's attorney in some matters and the latter being one of the hospital nurses.

Plaintiff left the hospital and returned to his rooms in the rooming-house portion of his business establishment on or about November 6, 1914. Just what relations Greenhood had with this business upon Yerrick's return does not appear. There is not any positive testimony that he took any affirmative action in connection therewith at all. One of the witnesses testified that Greenhood visited Yerrick on a number of occasions. Until the 12th of December he continued to be a director and officer of the corporation.

On or about December 12 a meeting was held in Yerrick's room at which there were present Yerrick, Elmore, Steinbrenner, Greenhood, Judge Webster, as Yerrick's attorney, John Campbell, an attorney representing William H. Houston in connection with the endeavor to collect or secure Houston's claim for rent, and the two bartenders, Bert Breeding and Eddie Randall. Mr. Houston, through the attorney Campbell, was preparing to attach the liquor stock for the past-due rent. Elmore testified that Judge Webster was sent for at Yerrick's request; that Greenhood and Steinbrenner had both, prior to that time, expressed a desire to get out of the company. Attorney Campbell had with him a form of assignment of the liquor license from the Yerrick Liquor Company to Houston, as security for the rentals due and to

become due, and informed Judge Webster in Yerrick's presence at the meeting that if the assignment was not executed, he had instructions from his client, Houston, to at once attach. Judge Webster then read the proposed assignment to Yerrick and explained to him that Houston wanted an assignment of the liquor license as security for the money claimed due him, and that it was also an agreement to assign all future licenses until Houston was paid up. Webster then asked Yerrick what he wanted to do about it, and Yerrick said, ''I can't help it, I will have to consent,'' to which Webster replied, ''I don't see where it is going to hurt you, and the license will stay there, and of course, when you settle up, it will be assigned to you.'' There had been, prior to this, during this same general conversation on the 12th some talk about Greenhood and Steinbrenner resigning. The corporation seal was at the First National Bank, and Webster and Elmore then went over to the bank for the seal, and on the way over there was some discussion as to the resignations to be signed by Greenhood and Steinbrenner and the form thereof. While at the bank the resignations were prepared, and Elmore and Webster returned with them and the seal to Yerrick's room. The assignment was then executed by the corporation, Yerrick signing as president, and Henry Greenhood as secretary, and the corporate seal was attached. When Yerrick signed his name he said, ''I don't know much about this, but it is all right if you say so,'' addressing himself to Judge Webster. A meeting of the directors was then held, Yerrick sitting at his desk, and Judge Webster standing by his side, telling him what to do. Greenhood and Steinbrenner than tendered their resignations, but it is not clear in what order they resigned. One resignation would be tendered and accepted and Bert Breeding was nominated and elected to fill one vacancy, and then the other resignation was tendered and accepted, and Eddie Randall was nominated and elected to fill that vacancy. It is stated that they were put in as directors at Yerrick's request.

On September 1, 1914, a note was purported to have been signed and executed by the Yerrick Liquor Company, by Henry Greenhood, secretary, which is marked "Canceled December 21, 1914." There was also put in evidence a note purported to have been executed on December 23, 1914, by the Yerrick Liquor Company, by W. H. Yerrick, president and also by W. H. Yerrick individually, to the First National Bank, for $950 payable on demand. At the same time there was executed, in the same manner, an agreement whereby it was recited that there was assigned as collateral security for the payment of the note bonded warehouse receipts for eight barrels of whisky, one diamond ring and one diamond pin. Elmore says that the consideration for the note was Yerrick's past-due indebtedness and an additional loan of $125, and that the note and agreement were executed in the presence of Eddie Randall and himself and then delivered to him.

On January 18, 1915, there purports to have been executed by the Yerrick Liquor Company, the corporation, an assignment to Louis Schramm, of Missoula, of all of its property for the benefit of its creditors. This assignment purports to have been acknowledged before Frank A. Roberts, the acknowledgment being by W. H. Yerrick, as president, and Bert Breeding, as secretary. Mr. Roberts was not called as a witness. There was an affidavit of good faith attached thereto, made by Yerrick as president of the company, and also by Schramm as the assignee. On January 21, 1915, there purports to have been made an inventory and appraisement of the property, which was sworn to by Yerrick, which gave the names of the creditors, with their addresses, the sum owed to each, and the nature of the claim, debt or liability and also an inventory and an appraisement of the property. It showed liabilities amounting to $5,968.68, and assets amounting to $5,103.46. Among the creditors listed there was the St. Patrick's Hospital, of Missoula, $161.42, Dr. Shea,

[65 Mont. 101.]

of Missoula, $343, and Bert Breeding, the bartender previously referred to, $275.

Pursuant to the power and authority contained in the written assignment, Schramm took possession of and sold the stock, converted it into cash, and paid the creditors the proceeds, each creditor receiving thirty-two and one-half per cent of his claim. The indebtedness to the bank was not paid, and the bank, through its attorney, caused a notice of sale of pledged property to be prepared and signed by Mr. Elmore, as vice-president, which referred to the note of $950, dated December 23, 1914. Service of this notice was acknowledged on the twenty-eighth day of April, 1915, by the Yerrick Liquor Company, by W. H. Yerrick, president, by W. H. Yerrick individually, and by Louis Schramm as the assignee in trust for the creditors of the Yerrick Liquor Company.

The sufficiency of the evidence to sustain the verdict and judgment is questioned by the specifications of error.

By instructions numbered 6, 7, 8, 9, 10 and 11, the jury were told what were some of the issues involved in the case, and that, if these issues were found in favor of the defendant Greenhood, then their verdict should be for him.

Considering these instructions in their order, by No. 6 the jury were told that: "If the plaintiff Yerrick made an arrangement with Elmore whereby the Yerrick Liquor Company was to be incorporated and the property of Yerrick turned over to that company, and that, pursuant to such agreement, * * * the plaintiff, assisted by the defendant Greenhood and the witnesses Parsons, Steinbrenner, and Elmore, signed articles of incorporation and formed the Yerrick Liquor Company, and that the plaintiff Yerrick executed a bill of sale transferring all his property to that company, and that at the time of so doing the plaintiff had sufficient intelligence and mind to understand the transaction and said instrument, and that he then and there signed the same by his mark and gave his consent to the formation of said corporation and the transfer of his property, if you so believe,

65 Mont.—8

your verdict should be for the defendant.'' This instruc-
[1] tion was in harmony with defendant's affirmative de-
fense. If Yerrick did engage in the transactions mentioned
in this instruction and if at the time he did possess suffi-
cient intelligence and mind to understand the transactions
and the instruments assigned by him by mark, then of course
he should not be permitted to prevail in this suit. He says,
in effect, that he was not during any of the time mentally
competent to do these things. The presumption is that he
was of sound mind during all of this period of time, and that
he comprehended and knew the nature and consequences of
his acts. (Rev. Codes 1921, sec. 10727; *In re Murphy's
Estate,* 43 Mont. 353, 116 Pac. 1004.) He had the burden
of showing his mental incompetency; but he was not required
to produce more than a preponderance of the evidence on this
question (Rev. Codes 1921, sec. 10672, subd. 5; *Gehlert* v.
*Quinn,* 35 Mont. 451, 90 Pac. 168), and, if there was sub-
stantial credible evidence showing lack of mental capacity
or any fact invalidating the transaction, it was sufficient to
go to the jury, though it be controverted (*In re Murphy's
Estate, supra*). The jury by its general verdict found this
issue in favor of the plaintiff. However, if this finding be
sustained, it would not be decisive of this case, because, even
[2] though Yerrick was not then mentally competent, if he
afterwards made ratification of the transactions as pleaded
in the answer, he is bound thereby. Therefore, whether or
not the acts and transactions relative to the organization of
the corporation were afterwards ratified by Yerrick, even
though he may not have been mentally competent at the
time of its formation, will be first considered.

Upon the principle that the act or transaction of any per-
son made while under mental disability may be ratified by
such person upon recovery or restoration to mental soundness,
which ratification may be made by any intelligent act or con-
duct of the party, made with full knowledge of the facts,
which clearly show an intention to be bound thereby (Elliott

on Contracts, sec. 381), the learned .trial court properly gave
instructions Nos. 7, 8, 9, 10 and 11, which in effect told the
jury: (7) That if they found that the plaintiff on or about
December 12, 1914, participated as an officer or stockholder
in accepting the resignation of old directors and the selection
of new directors for the Yerrick Liquor Company; or (8)
that if the plaintiff Yerrick on or about the twenty-first and
twenty-third days of December, 1914, executed certain notes
to the first National Bank of Missoula as an officer or as
president of the Yerrick Liquor Company; or (9) that if
Yerrick on or about the eighteenth day of January, 1915,
participated as an officer of the Yerrick Liquor Company in
executing an assignment for the benefit of creditors; or (10)
that if Yerrick on or about the twenty-first day of January,
1915, made and executed an inventory of the property of the
Yerrick Liquor Company as an officer or as president thereof;
or (11) that if Yerrick on or about the —— day of April,
1915, as an officer or as president of the Yerrick Liquor
Company accepted or acknowledged service of a notice of sale
of certain diamonds and whisky certificates—that if, upon the
doing or happening of any of the said events mentioned in
any of these instructions, Yerrick knew what he was about
and comprehended the nature of his acts, then the jury's
verdict should be for the defendant. That the several acts
or transactions referred to in these instructions actually took
place there can be no doubt. Whether Yerrick was mentally
competent at the times covered thereby is the question.

Whatever may have been the jury's belief as to Yerrick's
mental condition at the time it is claimed the corporation was
organized or during any of the time he was in the hospital,
can have but little, if any, bearing upon his mental con-
dition thereafter: First, because there was nothing in the
nature of his mental condition while in the hospital that
could in the very nature of things have any such bearing;
and, second, because the testimony is clear that from about
the middle of October until he left, on or about the 20th

of November, he showed decided improvement in his general physical condition, although he was still ill when he returned to his rooms. From on or about July 27 until about the middle of October he was at times delirious. There is not any testimony of his being delirious after October 14. But the fact that he was delirious at any given time or during [3, 4] any given period of time raises no presumption that such condition existed either at an antecedent or subsequent time. When it is said that a person is delirious, it is understood that he is suffering from delirium, which is defined as a disordered state, more or less temporary, of the mental faculties. (Century Dictionary; Webster's New International Dictionary.) Such condition may be due to various causes. The cause of Yerrick's delirium is not shown by any direct testimony, but it is clear that it was only intermittent or temporary, and it may, we think, be properly inferred from the evidence that such condition was the product of his disease intensified by fever, and that, when he became better of his disease, his delirium ceased. Without the cause there was not the effect. The delirium being intermittent the idea of continuity is excluded. (*In re Murphy's Estate, supra;* Browne on Medical Jurisprudence of Insanity, p. 532.) Therefore, when he was not in a state of delirium, the plaintiff's sanity is to be presumed. (Clevenger on Medical Jurisprudence of Insanity, p. 950.) There is not the slightest suggestion in the evidence that plaintiff made any claim of a weakened state of mind due to old age, or that prior to entering the hospital he was not mentally sound.

The only testimony bearing upon Yerrick's mental condition after he left the hospital is that of Dr. Shea, a Mrs. Quigley, and Judge Webster. Dr. Shea testified: "When he left the hospital he had recovered to some extent; that is, his temperature had dropped to normal, as I recall it, and for some little time after he left he was rather vague in his ideas about things, but I don't believe I would recall now—I say now there was some little time after, but I wouldn't recall

whether it was a few days or a few weeks or what.    *   *   * After he went home there was no occasion for me to charge my mind with any details of the case after he was discharged from the hospital except for a short time. Of course, he hadn't entirely recovered; he was brought home for the purpose of cutting down the expense; someone offered to take care of him. From the time he got home he gradually got better.''

Mrs. Anna Quigley, who was in charge of the rooming-house portion of the business after September 1, 1914, gave this testimony: ''Q. Mrs. Quigley, you saw Mr. Yerrick every day, I take it, while you were there during the months of January and December? A. Yes, sir. Q. And what was his condition as to being cognizant of what he was doing and as to knowing anything about the transaction of any business? A. Mr. Yerrick wasn't in any condition to attend to any business at no time. That condition continued after he got back from the hospital until along in May some time he began to get his mind back and could remember little things. *   *   * It must have been the latter part of November when I saw him [Greenhood] have any papers or be up there having any talk with Mr. Yerrick about his business. *   *   * What he did at any time that would lead me to believe that he was not in his right mind and incompetent, *   *   * when Mr. Yerrick came home from the hospital we had a bell put in from his room to mine so he could reach it. It was so that he could call me in the night, and he would ring that bell in the night and when I went in he would say, 'There is a hot stove in here with me,' and I would say, 'There is not, Mr. Yerrick,' and he would say, 'I am just burning up,' and I would have to look under the bed to satisfy him; and I know times he imagined there was people in his bathroom. He would ring four or five times in the night to see if there wasn't something hot in the bed and people in there. I never locked his door; he had an idea there was somebody coming around there for him. *   *   * Continuing now to along

about the latter part of the year, Christmas or New Year's, he had a cabinet in his room, and he claimed that he had some money in there that he was keeping for the Fourth of July. * * * He kept wanting me to look in the cabinet and he said he knew that money is in there. I told him it was not. He would do that four or five times a day. * * * .As to what was his condition of mind about the 1st of February, compared to what it was during the month of December and about Christmas-time, I will say that it was not good; it was just about the same. It was along in May some time that he first began to improve mentally. During that time he sometimes talked intelligently upon his business and sometimes he didn't. Now, there has been times he has been so I couldn't make him understand at all, and other times he could remember what I tell him.'' On cross-examination she testified: ''I say he came home from the hospital November 20. And I say at that time his mental condition was very bad. As to whether he didn't know anybody, I will say he didn't know everybody; he knows some of his friends; he would recognize his friends. I do not mean to convey to the jury the impression that he was entirely out of his mind; I wouldn't say that. There would be days that he would be all right, and there would be days he would be off again. That condition existed until along in the spring some time. I remember quite well the day Mr. Houston and Mr. Campbell were up there and also Mr. Elmore and Judge Webster and Mr. Roberts and the rest of them. They had been up there quite often. I don't know what time you have reference to, but they were up. I remember the first time Mr. Houston and Mr. Campbell were up there when they were wanting to get an assignment or something. At that time Mr. Yerrick's mental condition wasn't good. He didn't know what was going on. As to whether I don't know that Judge Webster was acting as Mr. Yerrick's attorney, I will say I don't know who was his attorney. I know Judge Webster

[65 Mont. 101.]

was his attorney. * * * Oh, there was times Mr. Yerrick would know things and you could talk and reason with him.''

F. C. Webster was called as a witness for the plaintiff, and testified as to the occurrences and transactions on December 12, at the time the assignment of the liquor license was made to Houston, and at the time of the resignation of Greenhood and Steinbrenner as directors and officers of the Yerrick Liquor Company and the election of Breeding and Randall in their stead. He testified relative to Yerrick's mental condition at that time as follows: ''At that time I supposed Mr. Yerrick knew what he was doing. He answered my questions. * * * As to whether from my observations at that time I thought he understood what was going on, I will say he understood what I asked him; I don't think I gave any thought to his mental condition. The last time he was in bed in the hospital, and now he was up and dressed and answered my questions. I know he didn't do much talking. He was pretty gloomy, but then he had been threatened with attachment, and he turned over his license to Houston. He wasn't very talkative, but he answered my questions. * * * There was nothing at that time to cause me to think there was anything wrong with his mentality; I didn't think anything about his mental condition. Of course, he answered questions. He replied intelligently to whatever I asked him. He said what I told him; I told him what was the proper way to carry out what I understood he wanted done.''

This was all of plaintiff's testimony in any degree bearing [5] upon Yerrick's mental condition after he left the hospital. It is entirely insufficient as tending to show want of mental capacity at the time of any of the transactions or incidents referred to in the instructions under consideration. Mrs. Quigley says that he was not entirely out of his mind, and that there would be days that he would be all right. But it cannot be said from her testimony, or, in fact, from any of the testimony on the part of the plaintiff upon this subject, that Yerrick was not mentally sound on any particu-

lar day or at the time of any one of the transactions referred to. Mrs. Quigley says that at the time of the assignment of the liquor license to Houston Yerrick's condition was not good, and that he did not know what he was doing. Except for Mrs. Quigley's testimony, there was not a word or suggestion that Yerrick was not mentally competent at all times. The most that can be said of her testimony is that it was her opinion that at some of the times after his return from the hospital he was not competent. Assuming that she possessed that degree of intimate acquaintanceship respecting Yerrick's mental condition as to render admissible her opinion (Rev. Codes 1921, sec. 10531, subd. 10), such an opinion is not conclusive on a court or jury. The facts of the transaction, what was said and done by Yerrick, and all the surrounding circumstances disprove such opinion. The opinion of a layman that a person is mentally incompetent, where the reasons for the opinion are no more satisfactory than given by Mrs. Quigley, will not be considered such substantial evidence as will warrant the submission of the question to a jury, in face of positive and affirmative acts and conduct clearly indicating mental capacity.

At the time to which Judge Webster referred, he was acting **[6,7]** as Yerrick's counsel. He is an able, competent lawyer. He was handling transactions that meant much to his client, and, if there had been in his mind the slightest suspicion that his client was not mentally competent to act, it is to be presumed that he would have observed such condition. He had known, and transacted business for, Yerrick for years. There was nothing in Yerrick's actions or conduct to cause him to question his mental capacity. He says that Yerrick understood what he asked him and made intelligent answers to his questions. He was the plaintiff's witness, and the plaintiff is bound by his testimony.

John L. Campbell, the attorney representing Mr. Houston at the meeting testified to by Judge Webster, says that plaintiff was perfectly competent and sound mentally at that time.

After these transactions on December 12, in which Judge Webster acted as his counsel, Yerrick made and executed notes to the First National Bank. He participated as an officer of the Yerrick Liquor Company in executing an assignment for the benefit of creditors. The minutes of that meeting at which a resolution was adopted authorizing the assignment show that his bartender, Breeding, who was then an officer of the corporation, was present, yet Breeding was not questioned as to Yerrick's mental condition, although he was called and examined as a witness. Louis Schramm, the assignee, who had previously known Yerrick, says that he was asked to act as assignee by Attorney Frank Roberts, who was the attorney for the First National Bank. While Schramm had at one time been in the employ of defendant Greenhood, there is not anything in the record casting even the slightest suspicion on his motives or good faith. Mr. Roberts took Yerrick's acknowledgment as an officer of the corporation to the deed of assignment, to which Yerrick and Schramm both made an affidavit of good faith before him. Breeding also signed the deed as secretary of the corporation. There is not any suspicion that Roberts was not acting in entire good faith, and it is unreasonable to suppose that he would be a party to the transaction even to the extent of taking the acknowledgment and swearing Yerrick to the affidavit of good faith if there had been any indication that Yerrick was not right mentally. It is not to be presumed that he would knowingly have taken the acknowledgment of an incompetent person.

There was an inventory and an appraisement made of the property in connection with the assignment proceedings. Yerrick swore to and signed this before Attorney Roberts. It gave a list of the creditors, among which was the St. Patrick's Hospital and Dr. Shea. At the time of the sale of the property pledged to the bank he accepted service of the notice individually and for the corporation. Here we have several acts and transactions of Yerrick covering a period

of time from December 12, 1914, to April 28, 1915, each one on its face seemingly that of a perfectly rational person, and each one tending to prove ratification by Yerrick of the transactions in connection with the organization of the Yerrick Liquor Company and the sale of his property to the corporation. So far as is shown, each one was his intelligent act, clearly indicating his intention to be bound thereby.

All this discussion and the conclusions reached are based upon the assumption that Yerrick's actions and conduct in the organization of the corporation required ratification, because, if Yerrick was mentally competent at the time of the formation of the corporation and the giving of the bill of sale of his property to it, there was not any need of any ratification. By its general verdict the jury found that the plaintiff was not mentally competent at this time. Whether the evidence is sufficient to support that finding, however, need not be considered, in view of our conclusion that, even though he was not mentally incompetent, he fully ratified such transactions. The court expresses no opinion as to his mental competency at that time or as to the sufficiency of the evidence on that subject to go to the jury.

Whether or not Greenhood's acts and conduct with the property and business in question are sufficient to constitute a conversion of it likewise need not be considered. The determination of that question would depend upon Yerrick's mental condition at the time of the incorporation of the Yerrick Liquor Company, as well as upon the question of ratification. If Yerrick was mentally competent to participate in the incorporation of that company and to execute a bill of sale to it of his property, being the same property which it is claimed by this suit was converted, then there could have been no conversion of it by Greenhood. If there was a corporation, he was one of its officers, and as such had a right to handle its property and business, and could not be held liable as for conversion for his actions. But, even though he was not competent mentally to participate in the formation of

[65 Mont. 101.]

the corporation, that fact, under the law of the case as contained in instructions Nos. 7, 8, 9, 10 and 11, would not warrant a recovery for Greenhood's acts, whatever may have been their legal effect. The court therefore expresses no opinion as to whether there was any conversion by the defendant Greenhood of the plaintiff's property.

Our conclusions make unnecessary any consideration of any of the other specifications of error alleged.

We are of the opinion that the action should be dismissed. The plaintiff has had every opportunity to present his case. The transactions of which complaint is made were had in 1914. The record does not show when the action was commenced, but the amended complaint upon which the case was tried was filed on October 25, 1918. There have been two trials. It is not to be presumed that plaintiff's witnesses will give any other or different testimony upon another trial. There is more than a mere failure of proof; the testimony shows that the plaintiff is not entitled to recover.

The judgment and the order appealed from are reversed and the cause is remanded to the district court, with directions to dismiss the action and enter judgment in favor of the defendant Henry Greenhood for his costs.

*Reversed with directions.*

ASSOCIATE JUSTICES COOPER, HOLLOWAY and GALEN concur.

Rehearing denied December 21, 1922.