ALLEN, RESPONDENT, *v.* PETRICK ET AL., RESPONDENTS;
LYONS ET AL., APPELLANTS.

(No. 5,279.)

(Submitted September 14, 1923.   Decided January 12, 1924.)

[222 Pac. 451.]

*Water Rights—Duty of Water—Ownership—When Appropria-*
*tion Complete—Economical and Beneficial Use—Equity—*
*Findings.*

Appeal and Error—Equity Cases—Findings—When Conclusive.
    1.  The court's findings in an equity suit will not be overturned on
    appeal unless there is a decided preponderance of the evidence
    against them, nor when the evidence, fully considered, furnishes
    reasonable grounds for different conclusions.

Water Rights—Beneficial Use.
    2.  The quantity of water which may be claimed lawfully under a
    prior appropriation is limited to that quantity within the amount
    claimed which the appropriator has needed, and which within a
    reasonable time he has actually and economically applied to a
    beneficial use, the principle of beneficial use being of paramount
    importance.

Same—Character of Ownership.
    3.  The appropriator of water does not own it, but has "a right
    of ownership in its use only, its use being declared by the Con-
    stitution a public one.

Same—Duty of Water for Irrigation—Economical Use.
    4.  In determining the duty of water appropriated for agricultural
    purposes courts should ascertain the quantity which is essential to
    irrigate economically but successfully the tract of land to be irri-
    gated, economy, however, not to be insisted upon to such an extent
    as to imperil success.

Same—Court not Bound by Stipulation of Parties as to Amount of
    Water Necessary for Irrigation of Lands.
    5.  Under section 7128, Revised Codes of 1921, the court in water
    right suits is not bound by a stipulation of the parties as to the
    general character and quality of the soil of their respective lands
    or the amount of water required for their successful and econom-
    ical irrigation.

Same—Evidence Offered for Certain Purpose may be Considered for
    Any Legitimate Purpose.
    6.  An item of evidence (notice of appropriation of water) offered
    and admitted for a certain purpose, may thereafter be considered
    for whatever evidentiary purpose it may legitimately serve.

Same—Notice of Appropriation—When Inadmissible in Evidence.
    7.  A notice of appropriation of water which does not comply with
    the requirements of the statute is not admissible in evidence.

Same—When Appropriation Complete—Date of Appropriation.

8. In the absence of compliance with the statute, an appropriation of water is not completed until the water is diverted and put to a beneficial use, and therefore the claimant's right must date from that time and not from a prior date on which it was shown that he did some work on the ditch.

*Appeal from District Court, Park County, in the Sixth Judicial District; C. D. Borton, Judge of the Seventeenth District, presiding.*

ACTION by George A. Allen against Tony Petrick, Addie Lyons, David Shorthill, Robert D. Shorthill, as administrator of the estate of Alice Shorthill, deceased, Robert D. Shorthill, as guardian of the person and estate of Charles Wesley Allen, a minor, Charles A. Shorthill, Elizabeth Lindsay and others. From the judgment rendered, the named defendants, other than Tony Petrick appeal. Modified and affirmed.

*Mr. Frank Arnold* and *Messrs. Gibson & Smith,* for Appellants, submitted a brief; *Mr. Vard Smith* argued the cause orally.

*Messrs. O'Connor & Miller,* for Respondents, submitted a brief; *Mr. James F. O'Connor* argued the cause orally.

MR. CHIEF JUSTICE CALLAWAY delivered the opinion of the court.

Strawberry Creek rises in the Absarokee Mountains, in Park county and flows westerly into the Yellowstone River. In 1880 and the following years settlers took ditches from the creek for irrigating adjacent ranches. As in nearly all cases of this character the amounts of water used were small at first and greater in more recent years. A controversy having arisen as to their respective priorities to the use of the waters of the stream the plaintiff brought this suit against the defendants. Practically all of the parties are successors in interest of the original appropriators. From the court's decree the defendants Robert D. Shorthill and others, owners, of the Shorthill or

Ringlesby right, and Addie Lyons, owner of the Meyer right, have appealed to this court. In brief, their contentions are that the district court erred in failing to give their respective rights the priorities to which they are entitled; erred in giving defendant Malcolm a right as of December, 1885, and in awarding him 380 inches of water; and erred in the amount awarded the defendant R. B. Forney.

The record in this case consists of three volumes, printed, over 900 pages in all, with original exhibits consisting of deeds, notices of appropriation, and the like. The cause was argued and submitted upon September 14, 1923. Shortly after this we took up its consideration. After reading all of the testimony, documentary exhibits and carefully considering the briefs in connection with the testimony and the maps which were certified to this court we found it necessary to call upon counsel for additional briefs. These have been furnished, the last having been filed December 14. Since that date the court has been engrossed with matters of grave general importance, which prevented sooner disposition of this case. After a further study of the record together with the supplemental briefs we are unable to reach conclusions which are satisfactory to us; but, as the parties seem to have produced all the evidence within their command no good purpose would be served by sending back the case, or any part of it, for a new trial. The trial court was confronted with that condition which frequently appears in water suits where old rights are involved: All or nearly all of the settlers who did the original work are gone. Those who do appear are hampered with failing memories or are unable to dissociate fact from hearsay. Neighbors testify from impressions remaining after the lapse of years; much of their testimony is guesswork. Men who were boys when the things inquired about were being done appear, and their testimony is colored by the free fancies of boyhood which memory still retains. So the appellate as well as the trial court must do the best it can with what it has to work with.

[69 Mont. 373.]

1. There is much contention over the Ringlesby right of the
[1] · Shorthills. In their answer the Shorthills claimed 300
inches appropriated in 1882. The court gave them 165 inches
as of 1897. It would be useless to discuss the testimony bear-
ing on this right. It is in confusion and hopeless conflict. It
cannot be said that the evidence preponderates against the
finding. This court will not overturn the findings of the trial
court unless there is a decided preponderance of the evidence
against them (*Copper Mountain M. & S. Co.* v. *Butte & Corbin
Con. C. & S. Co.*, 39 Mont. 487, 133 Am. St. Rep. 595, 104
Pac. 540), and, when the evidence, fully considered, furnishes
reasonable grounds for different conclusions the findings will
not be disturbed. (*Nolan* v. *Benninghoff*, 64 Mont. 68, 208
Pac. 905.)

2. The appealing defendants complain that excessive amounts
of water were granted to the defendants Malcolm and R. B.
Forney, and it cannot be denied that their complaint is well
founded. Malcolm was given 380 inches. He irrigates ap-
proximately 150 acres of land. Forney was given 250 inches
as of 1880, the first right in the creek, upon the basis of his
ownership of 160 acres of land irrigated by his ditches 7 and 8.
A considerable portion of this 160 has never been irrigated.
Across the creek he has 53 acres more not all of which is
irrigated, covered by a ditch known as No. 6. For this he was
given 100 inches as of April, 1901. Mary Forney, his wife,
has 40 acres irrigated by ditch No. 7, and for this she was
given 100 inches as of June 22, 1907. Curiously enough no
complaint is made respecting these 1901 and 1907 rights, prob-
ably because they cannot be supplied except in high water.
The foregoing illustrates that the waters of Strawberry Creek
were distributed with liberality, to say the least.

The quantity of water which may be claimed lawfully under
[2] a prior appropriation is limited to that quantity within
the amount claimed which the appropriator has needed, and
which within a reasonable time he has actually and economically
applied to a beneficial use. (*Power* v. *Switzer*, 21 Mont. 523,

55 Pac. 32; *Toohey* v. *Campbell*, 24 Mont. 13, 60 Pac. 396;
*Smith* v. *Duff*, 39 Mont. 382, 133 Am. St. Rep. 587, 102 Pac.
984.)   If comparison between the principles regulating the ap-
propriation and use of water is permissible it may be said that
the principle of beneficial use is the one of paramount im-
portance.

The appropriator does not own the water.   (*Creek* v. *Boze-
man Waterworks Co.*, 15 Mont. 121, 38 Pac. 459; *Anderson* v.
[3]  *Cook*, 25 Mont. 330, 64 Pac. 873.)   He has a right
of ownership in its use only.   The use of water in Mon-
tana is vital to the prosperity of our people.   Its use, even
by an individual, to irrigate a farm, is so much a contributing
factor to the welfare of the state that the people in adopting
the Constitution  declared it to be a public use.   (*Ellinghouse*
v. *Taylor*, 19 Mont. 462, 48 Pac. 757; *City of Helena* v. *Rogan*,
26 Mont. 452, 68 Pac. 798.)

In Montana, as elsewhere, when the early settlers made their
original appropriations they had little knowledge of the quan-
tity of water necessary to irrigate their lands to good ad-
vantage.   Ample quantities of water being available in the
streams   the settlers claimed extravagant amounts.   While
usually the ditches were comparatively small at first, these
grew in size from year to year.   To a large extent this was
necessary as the settlers increased their cultivated areas as
their means permitted.   But the duty of water was seldom, if
ever, understood.   Almost every irrigator used an excessive
amount of water, some all they could get.   Some actually
washed the seed out of the ground.   In the irrigation of hay
and pasture lands it was a common practice to "irrigate on
horseback," that is, the irrigator went on horseback with his
shovel to his main ditch or laterals at intervals—and sometimes
at long intervals—and "changed his water."   In many in-
stances, to use the phrase of the supreme court of Oregon, a
man used all he could get and got all he could.   When the
country became more thickly settled and the people began to
farm more thoroughly and according to more approved meth-

ods, it began to be understood by practical as well as scientific experience that the use of excessive quantities of water was detrimental rather than beneficial to the land. The fact became understood by many that much better crops were raised by small amounts of water properly applied than by excessive amounts howsoever applied. Yet here, as elsewhere, many still adhere to extravagant use of water, although it is apparent to the enlightened that these users are raising smaller and poorer crops than they would raise if they used water more sparingly and intelligently. (See Kinney on Irrigation, 2d ed., sec. 875.) The following observation by Mr. Kinney is also apropos: "Owing to the general lack of knowledge upon the subject, the courts were as ignorant as to the essential amount of water to successfully irrigate a given tract of land as were the settlers and practical irrigators. That this was the case one has but to examine some of their early decrees adjudicating water rights to various users." (Sec. 876.)

It is a matter of common knowledge in the several judicial districts of this state where irrigation has been practiced since the early days that extravagant quantities of water were awarded the litigants by the courts. In instances more water was awarded than some of the ditches of the litigants ever would carry; in others much greater quantities of water than the litigants ever did or could use beneficially. In some cases the courts were not to blame. The litigants agreed to get all they could. They even stipulated to the use of quantities of water ridiculously large for the amount of land irrigated. To check this practice respecting stipulations the legislature in 1905 passed what is now section 7128, Revised Codes of 1921. In water suits in which members of this court have been engaged the trial judges have been confronted with aged witnesses who testified to what took place in early days. These venerable men, having more or less knowledge of what they testified about, frequently looked through mental magnifying-glasses in attempting to recall forgotten things from bygone days. The difficulty encountered in attempting to do equal and exact

justice upon testimony of this character is always great and sometimes insuperable.

As a result of erroneous decrees awarding excessive quantities of water much water which should be available to subsequent appropriators has been denied them; yet year after year the owners of these swollen rights have attempted to use all the waters decreed them, to their own detriment, in order to "keep their rights alive." Others have never pretended to use their full amounts. Some, never needing their surplus, have leased or sold it, thus actually diverting the water from the use and purpose for which it was appropriated, to the detriment of subsequent appropriators. This should be prohibited by statute.

One should not be permitted to play the dog in the manger with water he does not or cannot use for a beneficial purpose when other lands are crying for water. It is to the interest of the public that every acre of land in this state susceptible to irrigation shall be irrigated. It is the writer's opinion that the legislature should enact a statute to the effect that, where one has not made a beneficial use of the whole or some part of the water claimed by or decreed to him, for a specified number of years, the part so unused shall be deemed abandoned *prima facie.* There might well be included a section providing that one who sells a part of his right because the land he owns and for which the water was appropriated does not require that surplus shall by the act of selling be held to have abandoned the part sold, the purchaser taking the right as of the date of purchase. This would be consistent with the intention of section 7097, wherein one is required to return his surplus water to the stream when he does not need it. Sections 7113, 7114, 7115, 7116 do not conflict with the foregoing for the reason that those sections evidently have to do with water appropriated for sale, rental or distribution.

A fundamental error into which the early day courts fell was the result of their failure to appreciate what has been termed the duty of water; that is, the extent to which and the

manner in which the water should be used by the appropriator.
[4] In determining the duty of water the court should ascertain the quantity which is essential to irrigate economically but successfully the tract of land to be irrigated. Emphasis should be placed upon economy of use. But economy should not be insisted upon to such an extent as to imperil success. "The higher the duty the larger the tract of land a definite amount of water will irrigate; the lower the duty the less land the same amount of water will irrigate. Or, to state the proposition in other language, the higher the duty the less quantity of water necessary to successfully irrigate a definite tract of land of a certain number of acres, the lower the duty, the more water required for the same tract of land." (Kinney, sec. 902.)

It is fair to say that the trial judge in this action was confronted with a number of the difficulties above adverted to; [5] indeed, it is fairly inferable that he was under the impression that there was a stipulation by counsel to the effect that two inches per acre was to be given the irrigated land involved in the suit, although no such stipulation appears in the record. We observe, however, that even if there was such a stipulation, the court should not have considered itself bound by it.

It was stipulated that the lands of the defendants Lyons, Shorthill, Malcolm and Forney were of the same general character as to quality of soil, and that "the amount of water required for their successful and economical irrigation would be the same."

Maxwell J. Wilcomb, witness for plaintiff, a civil engineer who was brought up on a farm near Twin Bridges, in this state, himself a practical irrigator and familiar with the measurement of water, testified that three-fourths of an inch to the acre would irrigate the Malcolm land.

Will S. Hartman, a well-qualified and experienced civil engineer, familiar with Montana conditions and a practical irrigator, in answer to the question, "Do you think that the

one inch to the acre would apply to all of the bench land and the valley land up there, as far as you are acquainted with it, as being the amount that would be required to satisfactorily irrigate that land as they irrigate up there?" said: "Not necessarily scientifically, but, as based on the same basis with decrees elsewhere in either the Yellowstone Valley, the Shields River Valley, or Park county, I would say that it would take at least that much."

3. The defendant Addie Lyons, successor in interest of H. D. Meyer, claimed an appropriation of 200 inches as of date May 1, 1884, and was given 400 inches as of January 1, 1888. The defendant Alex Malcolm, successor in interest of John Morrow, claimed an appropriation of 400 inches as of December, 1885, and was given 380 inches as of that date. The defendant Lyons deems herself aggrieved by the court's action, and we think her complaint is well founded.

During the trial counsel for plaintiff, who also appeared for [6] the defendant Malcolm, offered in evidence a notice of water right made by H. D. Meyer. It was admitted without objection. The apparent purpose of counsel who offered it was to establish the date Meyer claimed to have made his appropriation. It was, counsel said, an affidavit of intention, and admissible under the doctrine of *Sweetland* v. *Olsen,* 11 Mont. 27, 27 Pac. 339. Having procured its admission he may not now object to whatever evidentiary purposes it legitimately may serve. Except as to date of its filing the notice complied with the provisions of the statute then in force (Laws Mont. 1885, p. 130) in all essential particulars. In the notice Meyer claimed an appropriation of 200 inches of the waters of Strawberry Creek made May 1, 1884, for the purpose of irrigating land which evidently is that now occupied by the defendant Lyons. The ditch by which the water was taken from the stream was described with reasonable certainty. Other recitations in the notice need not be stated here. The notice was properly verified on the 12th of April, 1886, but was not filed until October 6, 1886.

J. W. George, a witness for the defendant Lyons, testified
that Meyer located on the Lyons place in the year 1883, built
a cabin in 1884, and began the construction of a ditch from
Strawberry Creek in that year in the spring, about June. The
ditch was two feet wide and ten inches deep, with the dirt
thrown on the lower side. He saw water running in it in the
summer of 1884, eight or ten inches deep. With this he irri-
gated that year a garden and patch of potatoes. He had about
two acres fenced. The witness saw water in the ditch in 1885.
Meyer was irrigating with it; he had in some wheat, oats,
potatoes and garden stuff.

The witness W. A. Hall testified that he purchased the Meyer
place in 1887. It was then known as the Hank Meyer ranch.
When he bought the place there was a ditch coming out of
Strawberry Creek just below the road. He put in a crop in
1888, in the early spring, three acres of potatoes and peas and
fourteen acres of barley. Hall said: "A Mr. Morrow had a
garden in there and we divided our water there below the
road." The indication was that crops had been raised upon
the place before 1888, as three or four acres had been plowed
on old ground, and there was a ditch running from the main
ditch around the plowed patch. Morrow enlarged above the
headgate where the water was divided. Morrow was in the
ditch before Hall purchased, but Hall did not know how long
before. Hall and Morrow had a little board headgate where
they divided the water. This was at a point two or three
yards from the creek. They divided half and half. They did
not have any trouble over the water and did not have any un-
derstanding about it. Hall said: "I understood I had the
prior right and perhaps he understood the other way. We had
no papers or anything between us." Hall's understanding was
that the enlargement of the Meyer ditch by Morrow was made
before he (Hall) came.

The witness Magee thought he had seen a ditch on the Lyons
place as early as the fall of 1883, and there was water in it
which came from Strawberry Creek.

We do not find any substantial contradiction of the foregoing testimony. There is no evidence in the record to substantiate the court's finding that the date of Morrow's appropriation was December, 1885. While a notice of appropriation [7] filed by Morrow February 14, 1890, was admitted in evidence, it was over an objection which should have been sustained. The notice would not have been admissible as evidence if it had been filed within the time prescribed by the statute. It did not comply with the requirements of the statute in at least one essential particular. (*Taylor* v. *Abbott,* 103 Cal. 421, 37 Pac. 408.)

It is pretty clear that Morrow did not use any water upon his land until 1887. There is not any testimony showing that he did. On the contrary, John A. Morrow, his son, who came with his mother to Strawberry Creek in 1887, he being then eleven years old, in speaking of the improvements then on the Morrow place, said: "Well, it was, most of it was fenced. There was a house and barn." And in answer to the question, "What do you know of there having been garden stuff or anything of that kind grown there on that place by your father?" replied: "Well, I should not say that there had anything been raised there."

Mrs. Bottler said Morrow worked for her husband in 1885, and he farmed her brother's place in 1886. He located his ranch after he was on her brother's place.

Mr. Shorthill, Mrs. Bottler's brother, said Morrow rented his place in the fall of 1885 and farmed it in the summer of 1886, and with Shorthill's team and his spare team Morrow hauled out the logs to build a house on the piece of ground he took up. Witness thought Morrow built in 1886. There is no suggestion that he irrigated on his place that year. Shorthill said: "As near as I can remember he [Morrow] took his first crop in 1887 from there."

The witness Forney first knew Morrow in 1886 when Morrow was living on the Shorthill place. In 1887 Forney worked

for Morrow and helped him put in his crop and that summer saw him irrigate.

John Morrow testified that the Meyer ditch was not connected with the creek until 1888, but he also said that Meyer used water through it in 1887. This he explained by saying that the water Meyer had in his ditch in 1887 was taken from the Morrow ditch into the Meyer ditch.

Another witness gave some negative testimony tending to show that the Meyer ditch was not connected with the creek until 1888.

Without pursuing this subject further, it may be said that the testimony tending to show that the Meyer ditch was not connected with the creek prior to 1888 is far from convincing. The evidence preponderates decidedly to the effect that Meyer [8] used water from the creek prior to 1887, as well as in that year, for beneficial purposes. Even if Morrow had done some work on his ditch, or upon the ditch which Hall refers to as the Meyer ditch, in 1886, as Morrow did not divert the water and put it to a beneficial use until the spring of 1887, he did not possess a completed appropriation until then, for he had not complied with the statute, and his right must date accordingly. (*Murray* v. *Tingley*, 20 Mont. 260, 50 Pac. 723; *Bailey* v. *Tintinger*, 45 Mont. 154, 122 Pac. 575.)

After a careful consideration of the evidence bearing upon the amount of land irrigated, the quality of the soil, the length of the ditches and the probable loss in seepage and evaporation therefrom, we conclude that the interests of the parties will be subserved amply as to quantity of water by awarding to the defendant Addie Lyons 200 inches as of May 1, 1884, and the defendant Alex Malcolm 200 inches as of date April 1, 1887.

4. As to the Forney right of 1880. The original ditch was dug by Jake Fleshman. Apparently this ditch is the one designated on the map, plaintiff's Exhibit "C," as Forney's Ditch No. 8. According to the undisputed testimony of Albert Fleshman, in 1883 this was the only ditch on the Fleshman

ranch. It seems the ditch became smaller than it was originally, and it was hard to get water through it. It "would only cover half the place," anyhow, so a new ditch was constructed, evidently ditch No. 7, designed to cover practically the entire south end of the present R. B. Forney land in addition to that covered by the original ditch. The new ditch was completed in 1886. It is evident that both ditches have been used in recent years. Ditch No. 8 has a capacity of 200 inches, while No. 7 has a capacity of 450. But eighty-two acres are cultivated under these ditches, but apparently additional land has been and is irrigated to produce grass. After study of all the conditions as the record discloses them with respect to this right, with particular attention to the land which apparently has been irrigated under the original as well as the 1886 ditch, we conclude that this right should be divided as follows: eighty inches as of 1880, and sixty inches as of May 1, 1886.

In speaking of inches of water we have reference to section 7108, Revised Codes of 1921, which prescribes that 100 miner's inches shall be considered equivalent to a flow of two and one-half cubic feet (18.7 gallons) per second.

5. The cause is remanded to the district court of Park county, with directions thus to modify its decree: The defendant Addie Lyons shall be given 200 inches as of date May 1, 1884; the defendant Alex Malcolm, 200 inches as of April 1, 1887; the defendant R. B. Forney, eighty inches as of May 1, 1880, and sixty inches as of May 1, 1886; and when so modified the judgment shall stand affirmed.

The defendants Shorthill and associates and Addie Lyons, having been successful in reducing the amounts awarded the defendants Forney and Malcolm, are entitled to recover their costs, or a part of their costs, as follows: The defendant Robert D. Shorthill and those who are interested with him in claiming the Ringlesby right shall pay two-thirds of their costs on this appeal and shall recover one-third thereof from the defendants

R. B. Forney and Alex Malcolm; the defendant Addie Lyons shall recover her costs as against said defendants Malcolm and Forney; and the defendants Malcolm and Forney shall pay their own costs.

*Modified and affirmed.*

ASSOCIATE JUSTICES COOPER, HOLLOWAY, GALEN and STARK concur.