Frederick Harper died on August 16, 1928, in Lewis and Clark county, leaving estate and property therein. His will *Page 359 
was admitted to probate on September 8, 1928. By the terms of his will his estate was left to the Montana Trust Savings Bank, as trustee, with power "to take, hold, manage, invest and re-invest the same, with full power to sell, convey, transfer, mortgage, exchange and, or, lease the same, or any part thereof."
The beneficiaries of the trust created by the will were Frederick R. Harper, his son, and Elizabeth Igel Harper, his daughter, both of whom were of lawful age at the time of his death. The property of the estate consisted of a house, lot, furnishings and a considerable number of bonds. The bonds were chiefly those of private corporations.
On September 16, 1929, the property of the estate was distributed to the Montana Trust Savings Bank, as trustee, as provided by the will of the deceased. By its terms the beneficiaries of the trust were to receive the income therefrom, and the property of the trust was to be divided in equal parts to the beneficiaries; and, as the beneficiaries should progress in age, at stipulated intervals of time each was to be paid one-third of his or her portion.
Thereafter, on May 23, 1931, the Montana Trust Savings Bank was duly consolidated with the First National Bank Trust Company, which continued in the administration of the trust.
On May 25, 1932, the trustee filed in the district court of Lewis and Clark county a first account, report and petition for settlement of the affairs of this trust. This report contains a detailed statement of the conduct of the affairs of the trust, showing the receipts, disbursements and the investments. Thereupon the beneficiaries filed their objections to the report and petition. By their objections they sought to have the court require the trustee to substitute securities, to be approved by the court, for certain securities which the trustee reported it was holding for the benefit of the trust, and which it had purchased with trust funds received upon the payment of bonds distributed to the trustee. The alleged objectionable bonds were three Middle West Utilities Company, *Page 360 
five per cent. notes, due June 1, 1933, which were purchased on September 17, 1930, for the sum of $3,000; two Minneapolis, St. Paul Sault Ste. Marie Railway, four per cent. bonds, due in 1938, purchased November 5, 1930, for $1,775; and fifteen bonds of the same railway company and of like maturity, which were purchased on December 31, 1930, for $13,143.75.
The trustee in its petition asserted that these particular securities, and others, were purchased with the approval of Frederick R. Harper, one of the beneficiaries, and with the written authorization of the other beneficiary. The beneficiaries denied these allegations by their objections, and asserted affirmatively that these securities were purchased without their consent or approval. It was further alleged in the objections that Elizabeth Igel Harper was in effect not mentally competent to sign an authorization or consent.
Without further detailing the various allegations, we think it sufficient to say that the issue was raised whether or not, concerning these alleged objectionable securities, the report of the trustee should be approved, or the trustee required to substitute other approved securities for those to which objection was made.
On these pleadings a hearing was had before the court sitting without a jury. Timely demand was made on behalf of the objectors for trial by jury, which the court denied. Inasmuch as it will be necessary to discuss the evidence later, we deem it more appropriate to defer all mention of it until it becomes essential in the orderly discussion hereinafter of the various questions necessary to a decision.
The trial court thereafter approved the report, except the item of $1,000 therein of the Middle West Utilities Company's notes, charged to Elizabeth Igel Harper's portion of the trust, was disallowed and directed to be treated as funds belonging to her uninvested part of the trust. The objectors have appealed from this order. The trustee has perfected no appeal and has made no cross-assignments of error as to the portion of the order adverse to its contentions below. *Page 361 
Objectors assign error on the ruling of the court denying[1] their demand for a jury trial. They rely upon the provisions of section 10033, Revised Codes 1921, which declare in part that "when a jury is demanded, the district court must impanel a jury to try the case, in the manner provided for impaneling juries in courts of record." The omitted provisions of the section relate to the conduct of the trial after a jury is impaneled. This section is a part of the chapter of our Code relating to the contest of wills. Section 10368 provides that the issues of fact joined in probate proceedings must be tried in conformity with the requirements of sections 10032 to 10038 of the Code.
The jurisdiction of the court to hear a proceeding of this nature arises out of the provisions of section 10352, which provides that a trustee of this character may from time to time pending the execution of his trust, or at the termination thereof, render and pray for the settlement of his account as such trustee before the district court in which the will was probated, and in the manner provided for the settlement of the accounts of executors and administrators. It is further provided in this section that where any trust has been created by or under any will to continue after distribution, the district court shall not lose jurisdiction of the estate by final distribution, but shall retain jurisdiction thereof for the purpose of settlement of accounts under the trust.
Section 10033 was first introduced into our statutory law by the provisions of section 21 of the Probate Practice Act passed in 1877 (Laws 1877, p. 245). Section 10368 was first incorporated in our law by section 326 of the Probate Practice Act of 1877 (Id., p. 324).
Section 10369 provides that if on written demand a jury is called by either party, and the issues are not sufficiently made up, the court or judge, after notice, must settle and frame the issues to be tried, and submit the same, together with the evidence of each party, to the jury, on which it must render a verdict. It is further provided therein that either party may move for a new trial upon the same grounds *Page 362 
and errors as provided in the Code for a civil action. Thus far the provisions of section 10369 are identical with the provisions of section 327 of the Probate Practice Act of 1877 (Laws 1877, p. 325). When we adopted our first Codes in 1895, the following provision was added to this section, being section 2924 of the Code of Civil Procedure of 1895: "If the trial of issues joined requires the examination of an account, the court or judge must try the matter or refer it, and no jury can be called." The sentence just quoted is not found in the corresponding section of the California Code of Civil Procedure, section 1717, which Code is the source of many of our Code sections. Prior to our adoption, however, of the California Code, the supreme court of that state, in the case of In re Moore's Estate, 72 Cal. 335,13 P. 880, had reached the conclusion that their section, without the addition made by our legislature in 1895, did not warrant the granting of a request for a jury in the settlement of accounts, basing its conclusions largely upon the provisions of other statutes deemed to be of importance as evidencing a legislative intention in accordance with its conclusions.
Section 10352 provides that the settlement of the account shall be in the manner provided for the settlement of accounts of administrators. Section 10302 provides that on the settlement of such accounts, the court or judge may appoint one or more referees to examine the accounts and make reports thereon subject to confirmation.
Apparently the legislature, when it enacted section 10369 in 1895 (as section 2924 of the Code of Civil Procedure of 1895) in its amended form, desired to remove all obscurity in the various sections, as pointed out by the California court in the case ofIn re Moore's Estate, supra.
In view of these various statutory provisions, without question the objectors were not entitled to a jury trial, and no error was committed by the trial court in refusing their demand.
The court below made no special findings on the various issues raised by the pleadings. The objectors, by numerous *Page 363 
assignments of error, seek to review the correctness of various implied findings of that court necessary in order to sustain the general finding.
The district court, when proceeding under the provisions of[2] section 10352, has the same general jurisdiction and powers as are exercised by a court of equity over trusts. (Philbrick v. American Bank Trust Co., 58 Mont. 376,193 P. 59; In re Estate of Hubbell, 121 Cal.App. 38,8 P.2d 530; Parkman v. Superior Court, 77 Cal.App. 321,246 P. 334; 11b Cal. Jur. 838.)
The objectors urge that the trustee was not permitted to[3] invest any of the trust funds in any form of securities other than United States, state, county or approved municipal bonds, or real estate mortgages. The basis of this contention is section 10306, which provides in substance that, pending the settlement of an estate, on petition of the executor or administrator, or any one or more of the heirs, legatees or devisees, the court may order that any moneys in the hands of the executor or administrator may be loaned for not to exceed one year on any of the above-mentioned securities upon approval by the judge or court. This statute, we think, is wholly without application in this case, for nowhere therein are testamentary trustees mentioned. The statute, by its terms, limits its application to those estates in process of settlement. This estate was closed, the property distributed. The statute authorizes a loan only for the period of one year, it apparently having been within the contemplation of the legislature that in most instances estates would be ready for settlement within that period of time; and therefore the legislature did not authorize the making of loans or investments in securities for any greater length of time. This legislative intention is manifest when we consider the provisions of various sections of the Code. The executor or administrator must give notice to creditors immediately after his appointment (sec. 10170); the maximum time to be expressed in this notice is ten months (sec. 10171). It will thus be observed that in the absence of delay necessary to litigate claims, to sell property *Page 364 
to pay debts, or to consummate proceedings to determine heirship, an estate would be in condition to be closed in approximately a year after the appointment of an executor or administrator. If it was necessary to dispose of property to pay debts, the estate would be without funds for investment.
It will be seen that this statute, even if it applied to testamentary trusts, would be unworkable, as they continue for a number of years. It would require reinvestment annually and new court orders approving the same, so that an undue burden of expense would be placed upon the trust in the conduct of all these proceedings. If the legislature had intended that testamentary trustees were to be included within the purview of this statute, it doubtless would have done so by language clear and explicit. This it did not do, and in construing statutes we are commanded not to insert what has been omitted. (Sec. 10519.) Our statutes contain no express provisions defining the duties or powers of a testamentary trustee in the investment or reinvestment of the funds of the trust.
Counsel for the objectors in their brief and on oral argument have devoted considerable space and time to the statement of the powers and duties of trustees in this respect. Although various courts have announced rules applicable to this question, we believe it unnecessary to investigate this field or to announce a rule (something which this court has not heretofore done) under the issues in this case, if the position of the trustee is correct, namely, that Elizabeth Igel Harper was competent and expressly authorized the investment made, and that Frederick R. Harper, the other beneficiary, also consented to or acquiesced in the various investments.
Objectors' counsel quote extensively, with approval, from[4] section 1074 of Pomeroy's Equity Jurisprudence (fourth edition), wherein the rules governing the actions of trustees are discussed at length. After this very able discussion, that very distinguished author makes this closing observation: "It should be carefully observed, in this connection, that if the *Page 365 
beneficiary is sui juris and competent to bind himself, his consent to the irregular investment would be a justification of the trustee's action, and a waiver of all claim against him for resulting loss."
In Perry on Trusts and Trustees (seventh edition), page 1449, it is said: "If the cestui que trust concur in the breach of the trust, he is estopped from proceeding against the trustee." To the same effect, see Preble v. Greenleaf, 180 Mass. 76,61 N.E. 808; Matter of Hall, 164 N.Y. 196, 58 N.E. 11; Blair v.Cargill, 111 App. Div. 853, 98 N.Y. Supp. 109.
It now becomes necessary for us to consider whether there was sufficient evidence in the record to justify the court in concluding that Frederick R. Harper consented to or approved the investments of which complaint is made.
During the time here in question, Dr. Frederick R. Harper, the beneficiary just mentioned, was located at the Mayo Clinic in Rochester, Minnesota. He was a duly licensed physician and surgeon and the holder of a number of college degrees. The evidence, which it is contended by the trustee supports the court's implied finding, consists largely of letters. It will be borne in mind that the assets of the estate were distributed to the trustee on September 16, 1929. On September 23 of that year a letter was addressed by the trustee to Dr. Harper, advising that the estate was now distributed, and that it was authorized to divide the trust property into two equal parts and to deliver to him one-third of his portion. A tentative plan of division of the trust estate was submitted. He was requested to examine the plan and to "let us know whether or not it meets your approval; also whether or not you wish your one-third of your portion delivered to you now." It was further stated that in order to make an absolute division, some bonds would have to be sold.
Following these portions of the letter reviewed, it was written as follows: "For this reason, and also in order to enable us to handle this trust to the best advantage for you *Page 366 
and your sister, Mr. Weir suggested that we have you and your sister sign and return to us the enclosed forms, giving us broader authority as to investments of the trust funds. In Mr. Weir's opinion, we would be limited, by the terms of the will, and the statute of the state of Montana, to invest or re-invest available funds of this trust only in United States, State or County Securities, which have a low interest rate, and which would prevent us from making more desirable investments. If this proposal meets with your approval, please sign one of the forms, and secure the signature of your sister on the other, and return the forms to us." Mr. Weir, referred to in this letter, was counsel for the trustee.
Dr. Harper forwarded the form to his sister, residing in Leavenworth, Kansas, and she signed and returned it to the bank. It is as follows:
"To Montana Trust Savings Bank, Helena, Montana.
"Gentlemen:
"Your are hereby specifically authorized to, in your discretion and as you may deem for the best interest of the trust estate, invest and reinvest the funds of the trust estate in the stocks, bonds or securities of private corporations, and you are hereby authorized to, in the exercise of your own judgment as to the best interests of the trust estate, hold in the trust any property received by you as Trustee from the Executor of the Will of Frederick Harper, deceased. This has reference to your trusteeship under the trust and trusts created under the Will of Frederich Harper, deceased, probated in the District Court of the First Judicial District of the State of Montana, in and for the County of Lewis and Clark.
"Dated September 21st, 1929.
"ELIZABETH IGEL HARPER."
On October 17, 1929, Dr. Harper answered the trustee as follows: "In regard to the form permitting the additional authority in investment. While I realize the possibility of greater earning power with the money properly invested, it is *Page 367 
of the greatest importance to me to have what little money there is in the trust absolutely safe at all times. Perhaps I am misreading or misinterpreting the statement, but it occurred to me that in signing this form I would be losing the guarantee of absolute safety that I have now. I could not afford to do that. If I am wrong in my interpretation I should be glad to have you explain this point." To this the trustee replied on October 21, the following being the pertinent portion of the letter: "The law of this state is very strict as to how we shall invest funds of trust estates, and in order not to punish you in the way of income by investing only in Government bonds, we have asked that you give us a broader authority to make investments, and this would bring to you a better rate of interest. I do not think it is necessary for me to tell you that no investments would be made that I would not personally make for myself, or for the bank, but unless you give us this authority, we will be compelled to invest in Government bonds, which in this day and age, would be ridiculous, and of course you are absolutely mistaken when you indicate that it is your belief that these funds are absolutely safe at all times, because we are carrying in this trust some investments made by your father, which by no means are absolutely safe at all times. We make no guaranty of any investments we make other than that we are responsible for the selection of investments to the best of our ability as to security, and to date we have never had to make excuses for such investments made by us." This letter was signed by Mr. T.O. Hammond in behalf of the trustee bank.
Dr. Harper responded to this, on November 5, as follows: "I feel that you are quite right about the small yield from Government bonds and the advantage of making wise investments. * * * I am quite willing to sign a statement allowing broader authority in investments as you suggest. However, inasmuch as I should like to get some experience in looking up possible investments, etc., would it be possible to reword the form to include a statement to the effect that I be consulted or conferred with before such investments are made?"
The bank in turn replied, on November 15, as follows: "I *Page 368 
see no objection to consulting with you regarding investments, and if you desire to have us refer all suggestions to you, there is no need of your signing the Power as your sister has done. As investment funds come up for consideration, we will submit our suggestions to you, and if you have any changes or other ideas, we will be glad to have them." This letter was also signed by Mr. Hammond.
On September 4, 1930, the bank informed Dr. Harper that $5,000 in bonds, belonging to the trust estate, had been paid, and submitted a list of bonds of four different private corporations suggested by the bank as appropriate corporate securities in which to invest these funds. Dr. Harper replied and suggested the bonds of one company listed in the bank's suggestion, and also the notes of two other corporations, among the latter being the "Middle West Utilities Company, 5 per cent., due 1932, yielding 5.04."
On September 13, 1930, the bank advised Dr. Harper that they had invested $2,000 in the bonds of the company suggested both by it and the Doctor, and $3,000 in the Middle West Utilities Company, five per cent., due 1933. In addition it was written in the letter: "In your letter you suggest that we purchase the Middle West Utilities Company maturing in 1932, but these are quoted above par and their yield therefore would be reduced to about 4 1/2%, while the 1933 bonds at the current price would yield about 5%." To which Dr. Harper replied on September 22, 1930, as follows: "The bonds you have selected are quite satisfactory."
On November 21, 1930, Dr. Harper was again advised that certain bonds of a par value of $13,000, belonging to the trust, had been called for payment, and were then out for collection. Appended to the letter was suggested a list of bonds. Soon afterwards when the trust officer of the bank was in Minneapolis, he called Dr. Harper over the long-distance telephone at Rochester, and discussed with him the advisability of purchasing with these funds the bonds — to which objection was made — of the Sault Ste. Marie Railway Company. Both Dr. Harper and the trust officer testified as to this conversation, *Page 369 
and the only dispute between them was that the latter testified that he advised Dr. Harper that the interest on these bonds was guaranteed by the Canadian Pacific Railway Company, whereas the Doctor testified that the trust officer said the bonds were guaranteed by the Canadian National Railway Company. The trust officer suggested during the course of the conversation that Dr. Harper make some independent investigation as to these bonds and advise him, which he did; and on December 6 Dr. Harper wrote to him as follows: "I looked up the bonds that you spoke of this morning. I am not sure that I got the right issue but the one that answered the description you gave me seems quite good. I will enclose the slip they gave me so that you can see the one I am thinking about. Thank you very much for all the interest you have shown." The slip referred to in this letter described the bonds which were purchased.
On February 3, 1931, the trust company in a letter to Dr. Harper inclosed "a complete report of your trust account for the year 1930," giving an account of all income collected "and transactions of principal, and also a complete inventory of the trust assets." All these notes and bonds — to which objection was made — were correctly listed in the inventory. On February 11 following, Dr. Harper addressed a letter to a trust officer, in which he said: "The report seems very satisfactory."
In addition to the foregoing, Dr. Harper testified that about[5, 6] December 17, 1930, after making some further investigation of the Sault Ste. Marie Railway Company bonds, he wrote the trustee expressing his dissatisfaction with this investment, and requesting it to substitute other securities. He testified that he wrote this letter, addressed to the trustee, with postage prepaid, and either laid it on the desk or placed it in the box for the reception of outgoing mail, at the Kahler Hotel in Rochester, and that this was the method he employed in mailing his letters. The letter was not produced at the trial. The trust officers of the bank all testified that they did not recall the receipt of any such letter, that they had searched through the files with diligence in an effort to discover it, and *Page 370 
that it could not be found. Their testimony in effect was a denial of the receipt of this letter.
It is doubtful whether the testimony of Dr. Harper was sufficient to raise the presumption of the receipt of the letter within the meaning of subdivision 24, section 10606, Revised Codes 1921. In the previous cases before this court wherein it was held that a presumption of the receipt of a letter by the addressee did arise, it was deposited in the United States postoffice. (McAuley v. Casualty Co., 39 Mont. 185,102 P. 586; Stewart v. Development Co., 66 Mont. 238,212 P. 1107.) We have no doubt that the presumption would arise where it was established that the letter was mailed in any receptacle, wherever located, maintained by the Postoffice Department for the reception of United States mail. Whatever may be the effect of the above testimony, however, as to whether or not the presumption arose, if we assume that it did, for the purposes of this opinion, the receipt thereof being denied, an issue for solution by the trial court thereby arose; and where this issue is determined by the court, or jury, on conflicting evidence of this character, this court will not disturb the conclusion of the trial court or jury. (Renland v. First National Bank,90 Mont. 424, 4 P.2d 488.)
It is contended by counsel for the objectors that, to[7, 8] establish consent or ratification by a cestui quetrust, the trustee must not only clearly prove the fact, but show that the ratification was made with full knowledge of all the material particulars and circumstances; and also, in a case like the present, that he was fully apprised of the effect of the act ratified and of his legal rights in the matter. (White v.Sherman, 168 Ill. 589, 48 N.E. 128, 61 Am. St. Rep. 132;International Trust Co. v. Preston, 24 Wyo. 163,156 P. 1128.) Confirmation and ratification imply to the legal mind knowledge of a defect in the act to be confirmed, and the right to reject or ratify it. (International Trust Co. v. Preston, supra.)
It is apparent from the quotations from the foregoing letters that Dr. Harper was advised that without his consent the trustee could not invest in any bonds of private corporations. *Page 371 
He requested that he be permitted to make suggestions and to consult with the trustee. This was done in each instance where investments were made. After all these investments had been made, they were truly reported to him, and he expressed his entire satisfaction with them. We are unable to point to a single instance where a material fact known to the trustee was by it concealed from him.
Much evidence was offered as to the ratings which certain recognized financial publications gave these bonds; but the net result of all this testimony was, admittedly, that while some of them did not have the highest rating possible for a bond issue to attain, all of them were rated, at the time the investments were made, as being bonds good for investment.
On the market, the Middle West Utilities Company notes, after their purchase, declined so that they were of little value. The evidence disclosed that at the time of the trial, notes, for which $1,000 was paid, were worth $82.50. They were, however, given the highest rating at the time of their purchase by financial rating agencies of admitted standing. With reference to the Sault Ste. Marie bonds, it was disclosed that while the market value had greatly declined since the date of their purchase, nevertheless the interest had been paid, and no witness was able to say, or did say, that in his judgment these bonds would not be paid at maturity; and the trust officer, testifying on behalf of the trustee, expressed the belief, based on substantial reasons, that these bonds would be paid at their maturity.
It is argued that before Dr. Harper could suggest to or consult with the trustee, these notes and bonds were already purchased by the trustee. They were, however, purchased with the funds of the trustee bank and not the funds of the trust; and before they were charged to the trust, Dr. Harper was offered an opportunity to suggest and consult, and he availed himself of this opportunity before the charge of the bonds and notes to the trust was made by the trustee.
Under the evidence in this case we cannot say that the evidence preponderated against the implied finding of the court that Dr. Harper consented to, or acquiesced in, the investment *Page 372 
of the trust assets in the bonds and notes to which objection was made.
Complaint is made of the fact that the trustee purchased these[9, 10] bonds with its own funds at a given date in New York, and that, after the receipt of the bonds and at the time they were turned over to the trust, the trustee received the accrued interest covering a period of less than thirty days between the date of the purchase and the date the bonds were actually charged to the trust. It is asserted that the trustee was using the trust property for its own benefit. (Sec. 7889, Rev. Codes 1921.) While we recognize the rule of law for which contention is made, in view of the fact that when the interest was paid on the bonds the trust would be reimbursed for this accrued interest, the funds of the trust were not invested by the trustee, or used by it, until the bonds were charged to the trust, it is without application here.
It is also argued that the trustee profited because it was shown that the market price, as disclosed by recognized reporting agencies, was slightly less in some instances on the date on which the bonds were charged against the trust than the price paid. The trustee charged the trust the price actually paid for the bonds, plus the accrued interest. It was developed on the trial of the case that the reports which were offered in evidence, and on which reliance was placed by the objectors, showed the closing price of the particular security on the date in question, and that often on any date it frequently occurs that any particular security is sold on the public market at various prices. Fluctuation in the market may occur during the course of a day, as well as from day to day. If it be said that the trustee should have charged the bonds or notes at the reported price, then, if the market had gone up between the date of purchase and the date of charging the bonds or notes to the trust, the trustee would have been entitled to the profit. Such a rule would lead to manipulation on the part of trustees seeking to profit at the expense of the trust. This may not be done. (Section 7889, supra.) *Page 373 
The beneficiary Elizabeth Igel Harper was a high school[11, 12] graduate and a graduate nurse. As stated above, she signed the authorization covering all these investments, with the exception of the notes of the Middle West Utilities Company; and, without question, as to the securities coming within her written authorization, her consent was binding on her, unless the contention made by the objectors that she was mentally incompetent is tenable.
This young woman did not testify or appear at the trial. No one testified as to her lack of mental competency, aside from her brother. He testified that he had examined her in 1928, and had seen her repeatedly thereafter, although it appears that during most of the time intervening between the first examination and the time of trial he was located at Rochester, Minnesota, and she at Leavenworth, Kansas, where she resided with an aunt. Numerous letters written by Elizabeth were received in evidence, the originals of which have been certified to this court. Nothing can be gleaned from any of them amounting even to a suspicion of lack of mental capacity.
Dr. Harper testified, in response to an inquiry as to the mental condition of his sister when he saw her in 1928, as follows:
"A. Her mental condition then was as it is now, a condition ofdementia praecox.
"Q. Would you explain what that is? A. Well, I would saydementia praecox is a constitutional mental disorder, occurring generally in young adult life, characterized by chronicity, generally some form, especially form of deterioration. * * *
"Q. Have you seen her subsequent to September, 1929? A. Yes, sir.
"Q. What was her condition then? A. It hasn't changed.
"Q. Would you say, in that condition, she was able to know what she was doing in regard to a business way? A. No, sir; this condition is generally characterized by impairment of the functioning of judgment.
"Q. Would she be able to handle her own affairs? A. No, sir. *Page 374 
"Q. From your observation of the case and your experience of a physician, are you able to state with reasonable certainty, whether she will ever recover. A. I am." He then expressed an opinion that she would not recover.
The witness further testified with reference to his sister's condition, as follows: "I would like to explain about her condition. She is suffering a condition of dementia praecox; a patient with dementia praecox, their mental functions are characteristically impaired in three ways: first, it is impaired in regard to the emotions, — in other words, they lose their emotions and become more or less apathetic; secondly, the function is impaired in regard to judgment and association, so a patient suffering from dementia praecox will have delusions relating to imagining things that do not exist, such as suspicions or imaginary — I should say imaginary or unfounded belief in things that do not exist. Furthermore, there is a paranoid phase to the disease, in which she would become suspicious of all acts of other people and believe other people were trying to persecute her or plotting against her. Thus, while it is unpleasant to bring up this sort of testimony, my sister was suspicious of me; thought I was trying to withhold things from her, and all that sort of things which made it a very difficult situation to handle. In the three phases of dementiapraecox, the memory is practically always preserved. A patient suffering from dementia praecox, while their reasoning and judgment would be badly impaired, could probably remember things very clearly. A person with dementia praecox could very easily have written that letter and still have no judgment of what they were writing."
It is manifest from the testimony of Dr. Harper that his sister was not "entirely without understanding so as to render her contract or consent entirely void." (Fleming v.Consolidated M. S. Co., 74 Mont. 245, 240 P. 376.) The presumption is that she was of sound mind during all this period of time, and that she comprehended and knew the nature and significance of her acts. (Sec. 10727, Rev. Codes 1921;Sommerville v. Greenhood, 65 Mont. 101, 210 P. 1048; Inre *Page 375 Murphy's Estate, 43 Mont. 353, 116 P. 1004, Ann. Cas. 1912C, 380.) Upon the objectors rested the burden of showing her mental incapacity and of proving that condition by a preponderance of the evidence. (Sommerville v. Greenhood, supra.)
The explanation of the doctor as to the meaning attributed to the term "dementia praecox" is not at all convincing that this young woman was lacking in mental capacity sufficient for her to make contracts. Without prolonging this opinion unduly, we have examined the work of Singer Krohn on Insanity and Law, and from such examination it does not appear by any manner of means that all persons, or any large percentage of persons, suffering fromdementia praecox are incapable of entering into contracts. (See statements appearing in that work on pages 57, 59, 119, 122, 132 and 206.)
In Herzog on Medical Jurisprudence, page 445, it is said: "Dementia praecox may sometimes be arrested in its progress; some cases may even improve, but most of them will go from bad to worse, living a long time."
Dr. Harper did not see his sister at the time she signed the written authorization. He did see her during the year 1929, but the length of time elapsing before or after the execution of this instrument, the record does not disclose. It may have been days, weeks or months.
The question for solution by the trial court was whether Elizabeth Igel Harper was competent at the time she signed this document, not whether she was competent before or after. (See, generally, Murphy v. La Chapelle, 95 Mont. 36,24 P.2d 131.)
The presumption that she was competent was a disputable presumption. In the case of Monaghan v. Standard Motor Co.,96 Mont. 165, 29 P.2d 378, 379, this court said: "Such a presumption is successfully controverted when proof to the contrary overcomes it. By proof that satisfactorily overcomes it, it is meant that which is sufficient to sustain the affirmative of an issue — a preponderance of the evidence. Therefore, when *Page 376 
the evidence preponderates against a disputable presumption, it fades away in the face of the contrary facts. (In re Wray'sEstate, 93 Mont. 525, 19 P.2d 1051; Welch v. AllPersons, 85 Mont. 114, 278 P. 110; Nichols v. New York LifeIns. Co., 88 Mont. 132, 292 P. 253.) The fact, however, that the testimony is uncontradicted is not sufficient to overcome a disputable presumption and thereby to warrant a directed verdict, where the inferences to be drawn from the facts and circumstances are open to different conclusions by reasonable men. (Maki v.Murray Hospital, 91 Mont. 251, 7 P.2d 228.) A mere denial by an interested witness controverting such presumption, which is not corroborated by other evidence, is insufficient to overcome the presumption. (Renland v. First Nat. Bank of Grass Range,90 Mont. 424, 4 P.2d 488.)"
Dr. Harper was a party to this proceeding, testifying with reference to the mental condition of his sister. The letters from her to the trustee were in evidence. They may have been more or less remote, in point of time, with reference to the date of the execution of the authorization, than were some of the times when he observed his sister. The form of authorization which Miss Harper signed was sent by the trustee to Dr. Harper, with a request that he secure her signature on it. He transmitted the form to her by mail, in compliance with his request.
In this state of the record, whether or not the opinion of Dr. Harper had any probative value was for the court. (Kelley v.John R. Daily Co., 56 Mont. 63, 181 P. 326.) There was evidence here to support the implied finding of the court. In the case of Bickford v. Bickford, 94 Mont. 314, 22 P.2d 306,308, we said: "There is, however, substantial evidence supporting all the court's findings. Upon this state of facts we are not permitted to disturb the judgment, being governed by the oft-repeated rule that this court will not overturn the findings of the trial court unless there is a decided preponderance of the evidence against them. When the evidence, fully considered, furnishes reasonable grounds for different conclusions, the findings will not be *Page 377 
disturbed. (Poague v. Poague, 87 Mont. 433, 288 P. 454;Allen v. Petrick, 69 Mont. 373, 222 P. 451; Ayres v.Buswell, 73 Mont. 518, 238 P. 591; Gravelin v. Porier,77 Mont. 260, 250 P. 823; McQuay v. McQuay, 81 Mont. 311,263 P. 683.)"
Objectors have made certain specifications of error relating[13] to admission of testimony over objection. If we assume that the testimony was inadmissible, the presumption obtains that, the court having tried the cause without a jury, it was so regarded by it in making its findings. (Bickford v. Bickford, supra, and cases there cited.)
We find no reversible error in the record.
The order appealed from is affirmed.
MR. CHIEF JUSTICE CALLAWAY and ASSOCIATE JUSTICES ANGSTMAN, MATTHEWS and STEWART concur.
Rehearing denied January 18, 1935.