Hon. F. P. POCHÉ,
Hon. R. B. TODD,
Hon. WM. M. LEVY,     *Associate Justices.*
Hon. C. E. FENNER,

---

### No. 1116.

SUCCESSION OF MÉLASIE HÉBERT.

33 1099.
50 437
33 1099
125 549
125 738

A natural child, pretending to have been legally acknowledged by her deceased parent, can oppose the application of collateral heirs for the administration of the succession of said deceased parent, without having first been judicially decreed to be an acknowledged natural child, as claimed. The proof of parentage and acknowledgment may be made on trial of the Opposition to the application for administration.

The restriction contained in Article 221 of the Code of 1825, viz: "No other proof of acknowledgment shall be permitted in favor of children of color," having been repealed by elimination from the Code of 1870, children of color have now, whatever be their descent, the right to prove their acknowledgment in the same manner as white children.

Acts of baptism are public acts, which require no proof of their genuineness; and certified copies of them, made by their proper custodians, are admissible in evidence as well as the originals.

A child whose parents, at the time of conception, could not contract marriage because one of them was a colored person, could legally be acknowledged after the prohibitory law was abolished.

The mother, in this case, was deaf and dumb, and was, several years after the acknowledgment, interdicted for insanity. These reasons were also urged to show the illegality of the acknowledgment, but were overruled by the Court.

No administrator should be appointed to a succession which is not burdened with debts and requires no liquidation.

APPEAL from the Twenty-Fifth Judicial District Court, parish of Lafayette. *Moulton, J.*

*M. E. Girard* for the Opponent and Appellant :

The capacity and status of an heir is to be determined by the laws in existence at the date of opening of the succession.

The status of a child depends upon that of the mother, the child of a free woman is free, and the child of a white woman is white.

Illegitimate children may prove their maternal descent and the acknowledgment of their mother by any legal evidence, for all purposes. 26 An. 99; 4 An. 305-6; C. C. 212; 6 La. 570.

The paternal descent of a child cannot be proven to affect his right of inheritance from his mother.

Insanity is not presumed and must be clearly proven to exist at the date of the act attacked on the ground of insanity.

No law requires a manual presentation of a child at its baptism by the mother.

The certificate of baptism in the usual form is entitled to full faith for all it contains germain to the act.

*C. Debaillon* for Defendants and Appellees :

First—Heirship of collaterals admitted and proved.

Second—Strict proof of descent and identity of child required. 11 An. 59; 6 An. 161. Burden on opponent. Same authorities.

Third—Opponent is a bastard, R. C. C. 202; 18 An. 590, and could not be acknowledged, R. C. C. 203-204; and cannot inherit. R. C. C. 920-918; 18 An. 590; 6 An. 161; 15 An. 342. The law reprobates the begetting of illegitimate children. 18 An. 592, &c.

Fourth—A person deaf, dumb and insane, cannot make a legal acknowledgment of a child. R. C. C. 1782-1788.

Fifth—Baptismal registry not sufficient, when one of the parents is white and the child colored. Old C. C. 221; 21 An. 437, &c.

Sixth—The simple Baptismal Act, without the declarations of the parents or of a duly authorized agent carries with it no civil effect. Marcadé vol. 2 p. 50, 75; R. C. C. 205-2987.

Seventh—The Baptismal Act is an act under private signature, due execution of it, as well as signature must be proved before it is admitted in evidence. 22 An. p. 458; Brief, p. 6.

Eighth—Priests are not officers, 10 An. 673. Proof that De Chaignoz was a priest was necessary.

Ninth—Acknowledgment of a natural colored child from a white parent cannot be established by presumption of facts. Old Code 221. Legal acknowledgment absolutely necessary. R. C. C. 918; 33 An. p. 282.

Tenth—Proof of maternity alone not sufficient.

Eleventh—Decision in 4 An. 305, not considered correct. See Brief, p. 11-13, and not applicable to the case at bar.

Twelfth—There was an absolute necessity in this State to discourage the amalgamation of the white and colored race, which did not exist in France. 6 An. 161; Old Code 95.

Thirteenth—Every claim, set up by natural children may be contested by those who have any interest therein. R. C. C. 207; 11 An. 59; Marcadé vol. 2 p. 71.

Fourteenth—The mention in the note of evidence, that evidence was objected to, without stating grounds, is not equivalent to the reservation of Bill of Exception. 32 An. 260; Acts 1877, E. S. p. 176, requires objections to be taken down, and also ruling of the judge thereon otherwise bill must be tendered.

The opinion of the Court was delivered by

BERMUDEZ, C. J.   The succession of Mélasie Hébert was opened by her collateral relatives, two of whom prayed to be appointed to administer it.  Their application was opposed by Emelia Hébert, repre-

senting herself as the acknowledged natural daughter and sole issue of the deceased, and averring that, in the absense of debts and charges, an administration was unnecessary and would prove onerous. She prayed that the petition be dismissed and that she be recognized as the sole heir of the deceased and put in possession of her estate.

An appearance was entered by the collaterals, in bar to the recognition sought by the opponent, charging her with being a bastard, entitled to no standing in court, previous to judicial recognition, which cannot be obtained in the form attempted.

On those issues, the parties went to trial. After hearing, the court rendered judgment rejecting the opposition, and the opponent has appealed.

The case appears to have been as warmly contested in the lower court as it was here; but the grounds for respective resistance are more easily ascertained from the course of the proceedings than from the pleadings.

We meet no difficulty in finding sufficient, nay, ample, superabundant evidence showing maternity and identity. Apart from the judicial admission of the collaterals in their answer to the opposition, the evidence shows that Mélasie was the mother and that Emelia is the daughter. No better proof could have been adduced of these two facts than the uncontradicted and unassailed testimony of the sister of Mélasie, who officiated on the occasion as midwife, who has known and followed the child from her birth to the day when testifying, she identified Emelia as such child in open court.

The contention is, that the opponent is a *colored* person, the illegitimate and unlawful fruit of the connection of the deceased, who was a *white* woman, with a man of *African* blood; that the opponent never was acknowledged by her mother, either in a notarial act, or in the registry of her birth or baptism; that, even had she been, the acknowledgment would be absolutely void, because made by a person insane, and violative of a prohibitory law, which forbids such acknowledgment in favor of children whose parents were incapable of contracting marriage at the time of conception, which was the case then between white and colored persons.

On the other hand, the opponent and appellant contends that she was legally acknowledged; that her mother was not insane; that she is not a person of color; that, if any incapacity existed, as charged, to her valid acknowledgment, it lasted only until it was obliterated by subsequent constitutional and legal provisions, and that the incapacity of an heir is to be determined at the moment of the opening of the succession.

We propose *first* to consider the objection to the form in which the

opponent has couched her demand for recognition, and *next* to deal with the case in other respects.

It is a familiar principle that, unlike legitimate heirs, natural heirs are not seized of the succession accruing to them, at the death of the *De Cujus*, and that the law requires them to be first recognized before they can be put in possession of the *hereditas jacens;* but this requirement is not to be extended so as to prevent a natural child, by one and the same proceeding, claiming such recognition, and upon it, contingently, from opposing an onerous administration of a succession accruing to him as an acknowledged natural child, and demanding possession.

The opponent, no doubt, had the right to have herself recognized *ex parte*, as is often done in practice, as the natural acknowledged daughter and only heir of her mother, and this would have satisfied the exigency of the collateral relations, of the recognition as a condition precedent to a standing in court. Instead of proceeding in that somewhat clandestine manner, she has boldly asserted her rights contradictorily with them, forced, as it were, by them to do so. She had no other alternative. She has thus enabled the claimants to oppose to her all the legal resistance in their power. They surely can have no cause of complaint.

The two grounds of the opposition of Emelia are not only not inconsistent, but, on the contrary, are perfectly concordant and can be inquired into with favor, as, otherwise, it would be driving her unnecessarily to two actions, which in the present instance are well united and can be determined by one and the same judgment. It is justly said that the law abhors a multiplicity of actions.

To decide otherwise, would be to permit the injurious dilapidation of an estate, under the eye of the party inheriting it, striking him with impotency, for the special and technical reason that he has not been previously recognized as an irregular heir. We do not consider that the law ever intended such a thing. .

We are, therefore, of opinion that the opponent was not required, in order to have a standing in court, to be previously recognized judicially as the natural child] of the deceased, and that she could file her petition for recognition and oppose the administration in the form in which she has done it.

We deem it unnecessary to pass upon the bills of exception taken to the admission of evidence offered to establish the color of the opponent.

Conceding *arguendo* that the fact charged is established, was it an impediment to the valid acknowledgment of opponent, and has that acknowledgment, if originally prohibited, continued to be such up to the death of Mélasie Hébert?

The first objections raised are : that opponent was not, in fact, acknowledged in writing in one of the modes prescribed by the law, as it stood at the time of opponent's birth in 1854, viz: by article 221 of the Code of 1825, and even then, that such acknowledgment would be invalid, because made by an insane person and because formally prohibited.

It is charged that, as under article R. C. C. 918 (912), natural children were and are called to the legal succession of their mother, when they have been duly acknowledged by her, it follows that, when they have not thus been acknowledged, they are not entitled to inherit from her. It is also charged that the acknowledgment of natural children was and still is required to be made by a declaration executed before a notary public and two witnesses, whenever it shall not have been made in the registry of the birth or baptism of the child; that no other proof was admissible in favor of children of color, and that no such acknowledgment could validly be made in favor of natural children, whose father and mother were incapable of contracting marriage at the time of conception.

Several of the questions presented in these objections or charges have already received judicial attention.

This Court has decided that the requirements of written recognition did not apply to white or colored children descending from white or colored parents; that the rule applied exclusively to children of color, descending from a white father. C. C. 1825; Art. 226, 221, 227, 228; 14 L. 542; 6 An. 129; 6 L. 569; 12 R. 56.

It has also decided that, under article 230 of the same Code, illegitimate children of every description, might make proof of their maternal descent, where the mother was not a married woman.

In Pitot vs. Jobert, 4 An. 305, the Court distinctly said: "The acknowledgment of an illegitimate child, which the law requires to be executed before a notary in presence of two witnesses, when it has not been made in the acts of birth or baptism, is that of the *father.*"

This was said in a case in which the question of *color* was not involved. It, therefore, settled that a white child could prove a valid acknowledgment by his mother, otherwise than in one of the modes pointed out by article 221. The Court referred to articles 221 and 230, 6 L. 570.

In the case of Hart, 26 An. 99, the Court distinctly affirmed this ruling. While we refer to this last case, we are not to be understood as admitting its correctness in all other regards.

Had not article 221 contained the further provision declaring that "no other proof of acknowledgment shall be admitted in favor of children of color," and had not article 226 permitted illegitimate children of color to prove their descent from a father of color, *only*, it is manifest

that under the Code of 1825, white and colored illegitimate children would have stood on a footing of perfect equality in that regard, in every respect. But what was the law relative to white children having white parents, was also the law concerning colored children having colored parents. The inhibition against acknowledgment other than written, was directed only against children seeking to prove descent from a white father.

The authorities referred to by the appellees, in 11 An. 59; 6 An. 191; 18 An. 590; 15 An. 590; 15 An. 342; 21 An. 437; are cases in which an adulterous bastard was excluded although acknowledged; in which the inheritance or succession of the father was claimed; where a marriage between a white and a colored person was declared an absolute nullity, not requiring proceeding to be so treated; where a child acknowledged in writing was allowed to inherit from his mother; where a white father, who had acknowledged a colored child, was permitted to inherit from him. They do not show that a child recognized otherwise than in writing by the mother, was not allowed to inherit her succession.

We do not consider as shaking the authority in 4 An. 305, the *dictum* of Mr. Justice Preston in the case of Dugue vs. Caruthers, 6 An. 158, which was not the *opinion* of the three judges composing the majority. Chief Justice Eustis and Justice Slidell merely concurred in the legal results presented in the opinion and decree, while Justice Rost dissented altogether. ' Whatever was said in the opinion on the subject of the necessity of an acknowledgment by the mother in one of the modes pointed out by article C. C. 221, was, besides, uncalled for and unnecessary in a case in which the question involved was as to the acknowledgment by a father of his natural daughter.

The French authorities mentioned, have no application, as, in France, the law is more strict than ours, and requires that the acknowledgments, not only be made in writing, but, also, be signed by the father or mother.

The restriction contained in article 221 of the Code of 1825, invariably requiring *written* evidence of the acknowledgment of children of color, had previously been repealed and was not in force, therefore, at the death of Mélasie Hébert. It was expressly eliminated from the revised Code of 1870, in which the first part of article 221 was embodied as article 203. The consequence of the repeal has been to confer on children of color, whatever be their descent; the same rights to prove their acknwledgment, as have always been enjoyed by children wholly of white parentage.

The opponent contends, however, that she has proved her acknowledgment by the act of baptism. She contends that she has also proved it otherwise, as she had the right to do.

On the trial, the original entry in the register of baptism was produced in open court by the priest who was the custodian of it. On objection to its being read, a copy of it was made and introduced in evidence in place of the original, notwithstanding objection. The ground of objection was not, that the copy was not properly certified, but that it was the copy of an original under private signature, the signature of which was not proved, and was the act of a third person.

The Code attaches to acts of baptism a high and valuable importance. They are legal evidence to prove the filiation of legitimate children, when kept agreeably to law, or to the usages of the country. R. C. C. 193 (212); 958 (952).

The Code expressly makes a "*transcript*," that is a *copy*, from the register, valid proof for that purpose. It authorizes acknowledgments of natural children to be made by such acts. R. C. C 203 (221), 204 (222.)

It empowers ministers of the Gospel, or priests of any religious sect, to celebrate marriages, and requires them to prepare an act of celebration of such marriages, which is to be signed by the parties, the witnesses and themselves. The acts, when thus drawn up, according to the usages of the country, or according to law, are public acts, authentic acts, which require no proof, and of which transcripts or copies can be legally made. Such acts are entitled to establish *prima facie* the correctness of their contents.

The lower court did not err in dispensing with proof of the genuineness of the entry in the register in which it was made, and which was brought into court by the priest entrusted with the custody of it, and who established the authenticity of the book itself. That was all that was necessary. The copy, made as it was, likewise was properly accepted. That act shows that, on the 12th of April, 1855, Emelia, born on the 18th of May, 1854, was baptized as the natural daughter of Mélasie Hébert.

It is not signed by the mother, but that is no objection. The act is drawn up as similar acts are, according to the usages and rites of the Catholic Church and of the country. Had it been signed by the mother, it would be conclusive against her of the fact of acknowledgment. 12 R. 552.

But it is charged that, as the act is unsigned, the opponent should have proved it to have been made in the form in which it exists, with the authority of her mother, direct or indirect, and that, even then, such authority would amount to nothing, as she, the mother, was insane.

The evidence shows that, although Mélasie was not present at and did not witness the baptismal ceremony, she was in an adjoining room, the communication door of which was open, and that she could see what was going on. The child was presented and held by the sister of

70

Mélasie. If the latter knew the usages of the church of her creed, she did not ignore that her name, as that of the mother of the child, would have to be given and would be inserted in the act. It is not shown that any objection was ever made by any one to the declaration, contained in the act, that Emelia was the natural daughter of Mélasie.

To prove insanity, a judgment of interdiction was produced, but it proves absolutely nothing on the question of illegal acknowledgment. It was rendered in 1861, while the baptism took place in 1855. It cannot be inferred, from the fact that Mélasie was afflicted with deafness and dumbness, that she was insane. The evidence does not show any fact from which the conclusion can be drawn. It is easy to understand, however, how the co-existence of both afflictions may have created that opinion. The evidence sufficiently shows that Emelia was treated in the family and otherwise as the natural child of Mélasie. There does not seem to be much dispute of the fact, the contention being apparently restricted exclusively to the *legal* effect of the acts of acknowledgment.

The next and last question presented is : Admitting that Emelia is the child of Mélasie, acknowledged by her mother as her natural daughter in a form recognized by law, can such acknowledgment produce effect in her favor, as she was conceived of a mother and a father who were incapable, by reason of color, of contracting marriage at the time of conception?

It is true that, in 1853, when Emelia was conceived, the law prohibited the marriage of white and colored persons (C. C. 95); but that prohibition was not such as could have prevented either the father or the mother from acknowledging her as his or her natural child. She is a bastard, there is no doubt, either because her father and mother could not have contracted marriage, or because her father is unknown, but she was not an adulterous or incestuous bastard, and it is only as to such that the prohibitory law, nullifying acknowledgments of natural children, was levelled.

The difficulty on the subject is not to be solved by article 204 of the R. C. C., referred to by appellees, and which is to the effect that the acknowledgment of natural children shall not be made in favor of children whose parents were incapable of contracting marriage at the time of conception, but by article 221 of the Code of 1825, which provided that such acknowledgment shall not be made in favor of children produced by an incestuous or adulterous connexion. Such was the characteristic feature in the case of Fletcher. 11 An. 59.

In Compton vs. Prescott, 12 R. 56, the Court distinctly decided that, although adulterous and incestuous bastards can never be acknowledged, and although there be a legal impediment to the marriage of a white person and of a person of color, the law does not extend to their

illegitimate or natural children. It, therefore, held that such children may prove their acknowledgment by a white father, when the acknowledgment was made as required by article 221; and, in support of that doctrine the Court referred to 4 La. 175, and 14 L. 545. There can be no doubt that, had article 221 of the Code of 1825 read as does article 204 of the R. C. C., quite a different question would have presented itself.

If the validity of the acknowledgment ever was questionable, it has ceased to be such by the changes brought about by the constitutional and legal provisions since enacted. It was a dormant acknowledgment, to produce or not effect, according to the subsequent will of the law-giver and dependent upon the contingency of its being vivified and validated.

In Girod vs. Lewis, 6 M. 559, the marriage of slaves, which could not produce any of the civil effects resulting from the contract of marriage, was declared to be susceptible of producing such effects on their emancipation. See, also, 6 L. 565.

At the death of Mélasie Hébert, in 1879, there would have existed no legal impediment to her marriage with Emelia's father, even if he was a colored man, and the right and capacity of Emelia to inherit would have to be and is determined by the laws then in force. R. C. C. 950.

A novel and interesting question,—entirely pretermitted by the parties, could have been presented,—a question which rises superior to all the considerations elaborated in this opinion, and which is : Whether, one afflicted, as the deceased was, with deafness and dumbness, and not shown to have known how to read and write, could be required to have been cognizant of the exigencies of the law governing the case?

Would it not be harsh, barbarous, to visit upon the innocent offspring, the consequences of the justifiable ignorance of the law by her unfortunate author? Under the charitable maxim, *Lex neminem cogit ad impossibilia*, would not the law come to the relief of the opponent, and supply in her favor the acknowledgment which her mother is charged with not having made?

It has not been shown that the estate is burdened and requires a liquidation. The opposition to the application for an administrator is well founded. 32 An. 321.

It is, therefore, ordered and decreed that the judgment of the lower court be reversed, and proceeding to render such judgment as should have been rendered,

It is ordered, adjudged and decreed that Emelia Hébert be and she is hereby recognized as the natural duly acknowledged daughter and sole issue and heir of Mélasie Hébert; that her opposition to the appli-

cation for the administration of her mother's estate be sustained and the petition therefor be dismissed.

It is further ordered and decreed that, as such daughter and sole heir, she be put in possession of her said mother's estate, and that the appellees pay the costs in both courts.