RAWSON v. HARDY et al.

No. 5395.   Decided January 8, 1935.   (39 P. [2d] 755.)

110

*J. E. Evans* and *De Vine, Howell & Stine*, all of Ogden, for appellants.

*J. Quill Nebeker, Arthur Woolley*, and *L. J. Holther*, all of Ogden, for respondent.

MOFFAT, Justice.

This action, in equity, seeks to have set aside, first, a deed alleged to have been made by a person, incompetent; and, second, the cancellation of a mortgage, the execution of which was obtained from the alleged incompetent without consideration and by means of fraud.

The complaint alleges the appointment of Mary E. Rawson as the guardian of the alleged incompetent, Clarence Hardy, sometimes Clarence P. Hardy, on the 7th day of April, 1930. That the incompetent was about 39 years of age when the complaint was filed in June, 1930. That he is now an inmate of the State Mental Hospital at Phoenix in the state of Arizona. That on June 1, 1923, and prior thereto, the incompetent was the owner of a described tract of land subject to a life estate in favor of his mother, Mary J. Hardy. That on June 1, 1923, the incompetent joined with his mother in executing a deed to the described premises to a brother, Lewis J. Hardy. That in payment for the conveyance of the property, consisting of a farm at Roy, Weber county, Utah, on the same day, Lewis M. Hardy and his wife, Ella M. Hardy, executed three mortgages, viz.: A first mortgage to the Ogden State Bank for $3,200, a second mortgage to the incompetent for $7,500, and a third mortgage for $2,861.65, all securing the payment of notes executed simultaneously therewith.

That on October 7, 1926, Lewis M. Hardy conveyed the premises in question to J. Dwight Harding. That on or about December, 1926, J. Dwight Harding without consideration and fraudulently secured the release of the $7,500 mortgage held by Clarence Hardy against the property originally conveyed to his brother, Lewis M. Hardy. That on December 22, 1928, J. Dwight Harding and his wife, Ada Harding, executed a deed to the said premises free from the said mortgage to Robert N. Hamblin. Said conveyances are alleged to be void. The guardian on behalf of the alleged incompetent repudiates the deed and the release of the mortgage. The value of the property is alleged, and the complaint contains a prayer asking that the deed from Clarence Hardy to his brother, Lewis M. Hardy, and the release of the mortgage be set aside and canceled, and prays for such further relief as may be agreeable to equity.

The defendants demurred, generally and specially. The demurrer was overruled, and thereupon answers were filed

putting in issue the material allegations of plaintiff's complaint. The case was tried to the court sitting without a jury. The court found the issues in favor of the plaintiff and decreed that the deed and the release of the mortgage were null and void and ordered them canceled of record.

Aside from the question of sufficiency of the complaint, raised by defendants' demurrer, all of the points raised by the assignments of error may be considered substantially as grouped and argued in the submitted briefs, viz.: (1) The sufficiency of the evidence to establish incompetency. (2) The question of the life estate of the mother sold at the time of making the deed and the payment of the mortgage given therefor. (3) The admission in evidence of the record of adjudications of insanity and commitment to mental hospitals of Clarence Hardy for the purpose of proving incompetency at the time of the execution of the deed and release of mortgage respectively. (4) That the judgment or decree in effect is inequitable and establishes a result profitable to the alleged incompetent, at the cost of innocent parties. This last question is disposed of with the others and will not be noted separately.

The question raised by the general demurrer raises the question as to whether Mary E. Rawson is suing as the guardian of Clarence Hardy, or in her own right. The complaint is entitled, "Mary E. Rawson, as Guardian of the Estate of Clarence Hardy, Incompetent," against the named defendants. The first paragraph of the complaint alleges: That the plaintiff, "now is, and ever since the 7th day of June, 1930, has been, the duly appointed, qualified and acting guardian of the estate of Clarence Hardy, an incompetent, and that Clarence Hardy is also known as Clarence P. Hardy."

It is also alleged, "That on June 1, 1923, and prior thereto, the said incompetent was the owner, subject to a life estate," of his mother, Mary J. Hardy, of the tract of land

described in the deed attacked and sought to be set aside as void.

When the probate files were offered in evidence, they were objected to upon the ground the answers admitted the appointment of the guardian and the authority to sue. It is clear the real plaintiff and the real party in interest is Clarence Hardy. While the title heading, "Clarence Hardy by Mary E. Rawson, Guardian," is the usual and preferable form of statement, the statement Mary E. Rawson as guardian is fairly equivalent and may be fairly rendered as Mary E. Rawson in the capacity of guardian of the incompetent. This is especially true in the light of the relationship revealed by the allegations of the complaint.

It would seem to be unnecessary to further discuss the question. We do not find any merit in that contention, nor do we see how the defendants could have been misled or prejudiced.

It is suggested that the judgment is not in the proper form. If the judgment fails to conform to the issues, a question not before us, no doubt the parties affected thereby may by a proceeding in the district court have such matter corrected.

As to the special demurrer a different situation is presented. Defendants specifically attacked the allegations of paragraph numbered 10 upon the ground that it could not be ascertained therefrom what the facts are of the alleged "meditated fraud, imposition, undue influence and persuasive arts," exercised and practiced upon said incompetent. That part of paragraph 10 of the complaint is the only part of the complaint either directly or indirectly attempting to allege anything fraudulent relating to the conveyances attacked. It is in this paragraph that the release of the mortgage is attacked. That part of the paragraph attacked reads:

"* * * On or about December 14th, 1926, without consideration, and by reason of the exercise of meditated fraud, imposition, undue

influence and persuasive arts practiced upon him (the incompetent) by the said defendant, J. Dwight Harding, and his incompetency aforesaid, the said incompetent was persuaded to make, execute, and deliver to said J. Dwight Harding an instrument in form a release, purporting to release said premises from the lien of said second mortgage * * *."

The findings of the court are made in the identical language of the complaint as to the "meditated fraud, imposition, undue influence and persuasive arts," and the conclusions of the complaint are therefore not aided by any findings of fact.

The special demurrer was a direct attack upon the particular allegations. Although the complaint states a cause of action based upon incompetency and failure of consideration, yet when allegations claiming fraud are directed at the voiding of the release of the mortgage because of such claimed fraud, the allegations constituting fraud must be allegations of the facts. Evidence tendered in support of mere conclusions upon objection should have been rejected, and even though received without objection, when followed by findings no better than the conclusions set forth in the complaint, the error is not cured. The special demurrer should have been sustained.

"Fraud, when relied upon as a defense, must be specifically pleaded in an answer, as well as in a complaint; the facts and circumstances relied upon should be set out, in order that the court may know whether there was such fraud as will be of avail to the pleader, and also that the party charged with fraud may know the nature of the charge, and be prepared to meet it." *Wilson* v. *Sullivan*, 17 Utah 341, 53 P. 994, 996; *Muldoon* v. *Brown*, 21 Utah 121, 59 P. 720.

The allegations of fraud referred to in plaintiff's complaint present no facts from which an issue may be formed; no specific fact, act, or words of persuasion, art, imposition, or circumstance touching any of them or what means, devices, or powers, if any, were used to influence the acts about which complaint may be made.

It is not necessary to set forth in detail the assignments of error relating to the question of competency or incompetency of plaintiff's ward.

This being an equity case, the court of necessity has examined the record. The assignments of error relating to appellants' objections to the court receiving in evidence the records of the commitments of the alleged incompetent to insane asylums, and those assignments directed at the question of incompetency overlap, and as they can hardly be considered independently will be considered together. It is not to be inferred that if there be sufficient competent evidence in the record to support a finding of incompetency aside from the evidence furnished by the records of the insanity proceedings, that the admission of the record evidence in such a cause tried to the court, when the evidence otherwise justifies the findings, that the decree will be set aside because of the admission of such evidence.

In these days of advancing technical knowledge, and classification of mental manifestations, and aberrations by psychologists, psychiatrists, and others skilled in identifying and determining at least by a tabulated name the varying deviations from what is usually regarded as the normally sane person, general statements are subject to many qualifications. Generally, it is regarded as a principle of law that the presumption of sanity operates in favor of a person at the outset, and so continues until the person alleging insanity discharges the burden of proof thus imposed. It is also said in the books that insanity once proved is presumed to continue only in cases of a permanent or chronic nature, and that if an insanity admitted or proved is only occasional or intermittent the presumption of its continuance does not obtain. Some difference of opinion is found in the application of the rules of evidence in relation to wills and other types of cases. With reference to conveyances and contracts alleged to have been made by incompetent persons, there is no departure from the general rule that the burden of proof rests on the one who asserts in-

sanity to prove that the person whose sanity is attacked was incompetent to comprehend and understand the terms and effect of the contract or conveyance claimed not to be of binding force upon the incompetent because of the condition alleged.

Trial courts are therefore confronted with the problem of admissibility of evidence tending to prove or failing to tend to prove the issue of incompetency. In the case of *Legate* v. *Clark,* 111 Mass. 308, it was contended that the record of an inquisition of lunacy was admissible in evidence even as against strangers. The trial court had admitted the record. The appellate court held it was error, and after quoting a part of the statute relating to the commitment of insane persons said:

"A man may be a proper subject for the treatment and custody of a lunatic hospital, and yet have sufficient mental capacity to make a will, to enter into contracts, to transact business and to be a witness."

A person's mental capacity, or power to reason, understand, or determine a given matter at a given time in the judgment or opinion of another involves a deduction, an opinion, a judgment, or arrival at a conclusion from the conversations, acts, declarations, conduct, or behavior, as well as the mental manifestations of the subject as determined or found by the person expressing the opinion, drawing the conclusion, or formulating a judgment thereon. The question of admissibility of offered evidence presents to the trial court a situation calling for a conclusion of the court in the form of a judgment, after applying the factors of the situation presented to the known rules of the law of evidence. Thus the admissibility or nonadmissibility of proffered evidence of a person's mental condition at a given time, as shown by a record of the inquisition held, is generally held to be admissible to prove the mental condition at the time of the holding of the inquisition; but whether or not a record and judgment thus made is competent or relevant evidence at a subsequent time to

prove mental capacity at a different time relating to different matters and different persons when different interests and issues are involved is another question, and upon which the authorities are divided. We think, however, the weight of authority and the better reasoning generally admits the record. Not that the record is admissible because it is a public record or that its admission establishes a prima facie case; but if, in the judgment of the trial court, the record of the insanity hearing including the commitment is not so remote as to be immaterial, and if reasonably relevant and the matters determined make it competent, the record should be admitted. The weight to be given it is for the court, or the jury under proper instructions of the court. It is a matter largely within the sound discretion and judgment of the trial court whether or not the record is sufficiently relevant, competent, and material to justify its admission.

The situation with many of the factors to be weighed by the trial court is stated in the case of *McAllister* v. *Rowland*, 124 Minn. 27, 144 N. W. 412, 413, Ann. Cas. 1915B, 1006, thus:

"Whether the person's mental condition at the time covered by the finding is evidence of his mental condition at a prior time would seem logically to be question of the probative force or weight of the evidence, or its tendency to prove the fact in issue. It is difficult to see why the evidence should stand on any different footing than does the oral evidence of witnesses to prove the mental condition of the testator at a time after the will is made, and, as we have stated, the rule is uniform that such evidence may be received. There are, however, a number of cases that hold the finding of incompetency in the subsequent proceedings inadmissible. *In re Pinney's Will*, 27 Minn. 280, 6 N. W. 791, 7 N. W. 144; *Sprinkle,* v. *Wellborn*, 140 N. C. 163, 52 S. E. 666, 3 L. R. A. (N. S.) 174, 111 Am. St. Rep. 827; *Hovey* v. *Chase*, 52 Me. 304, 83 Am. Dec. 514; *Rippy* v. *Gant*, 39 N. C. 443; *Jackson* v. *King*, 4 Cow. (N. Y.) 207, 15 Am. Dec. 354; *Emery* v. *Hoyt*, 46 Ill. 258; *Shirley* v. *Taylor's Heirs*, 44 Ky. [5 B. Mon.] 99, 102; *Succession of Herbert*, 33 La. Ann. 1099; *Rhoades* v. *Fuller*, 139 Mo. 179, 40 S. W. 760. In none of these cases is the decision of the particular question fortified by either sound reasoning or authority. In some

the time was so long after the will or deed was executed that the exclusion is justified on the ground of remoteness. In others the argument is the hearsay rule, and that the parties to the litigation are different, an argument that applies with no greater force than when the time under inquiry is covered by the finding. But in most of the cases the evidence is excluded with the bare statement that it is incompetent, or that it proves nothing."

It is not necessary to further discuss this phase of the subject. The divergent views, classes of cases wherein such evidence has been admitted or rejected with some reasons pro and con, are collected and discussed in 3 Wigmore on Evid. (2d Ed.) § 1671; also, 14 R. C. L., insanity, § 67 et seq.

What weight the trial court may have given to the evidence of the proceedings committing Clarence P. Hardy to the mental hospital in Washington in July, 1912, to the Utah Hospital in November, 1913, and lastly to the Arizona Hospital in September, 1928, we have no means of determining except by a comparison with other evidence in the case. Appellant argues that:

"The trial court must have proceeded upon the erroneous theory that the inquisitions upon which Clarence P. Hardy was found to be insane to the extent that he was a proper person for treatment in the mental hospital of the States of Washington and Utah constituted adjudications of incompetency, and that the record of such proceedings imparted notice to all the world of such incompetency, and upon the further theory that such incompetency continued to the time of the trial, because he had not been judicially restored to competency."

After a careful reading of the whole record and examination of the exhibits constituting a part thereof, we are convinced that appellants' position as to that matter is correct.

There was no expert evidence submitted to the court. The opinions of laymen who have only had occasional opportunities for observation and at remote times, and who have

had no business transactions or intimate association with the alleged incompetent, cannot be considered such substantial evidence standing alone, nor in the face of conflicting evidence of persons who have been parties to transactions and incidents intimately connected with the questioned transactions, as will warrant, in the face of positive affirmative acts, conduct, and grasp of the problems involved, a finding of mental incapacity. *Somervile* v. *Greenhood*, 65 Mont. 101, 210 P. 1048.

Clarence P. Hardy at the time of trial of this cause, 1932, was about 41 years of age. He was born at Hooper in Weber county, Utah. At an early age he with his parents moved to Roy in the same county where he resided with them. He attended school; but never went beyond the fifth grade. On July 6, 1912, while on a visit with his father to a brother in the state of Washington, Clarence Hardy was committed to the hospital for the insane. On the 7th of October, 1912, he was discharged as "improved." He returned to his home in Utah. November 13, 1912, he was by the district court of Weber county committed to the State Mental Hospital at Provo, Utah. He was released on bond to his father by an order of the district court on May 16, 1913, and on August 11, 1913, was recommitted, and on October 19, 1914, by an order of the court to the superintendent of the State Mental Hospital, "the applicant (Nephi Hardy, father of Clarence) having complied with the law in such cases made and provided, you are hereby instructed to deliver the said Clarence Hardy to the custody of his father, Nephi Hardy."

From the time of this second release in October, 1914, Clarence Hardy lived with his parents on the farm at Roy. By a deed bearing date the 24th day of November, 1916, Nephi Hardy and his wife, Mary Jane Hardy, father and mother, respectively, of Clarence P. Hardy, deeded to him subject to a reserved life estate of the grantors the farm at Roy consisting at that time of about 33 acres. Clarence's father died about 1920. From 1914 until 1923 Clarence lived upon the farm, worked with his father while his father

lived, and afterwards operated the farm himself. In 1921 Clarence mortgaged the farm to Joseph Weston for $500. This mortgage was released about the time of the conveyance of the property to his brother, Lewis M. Hardy. By a deed dated June 1, 1923, and recorded September 7, 1923, Clarence P. Hardy and his mother, Mary Jane Hardy, conveyed the fee and the life estate with which the respective parties were vested to Lewis M. Hardy. This is the conveyance by this action sought to be set aside as well as the release of the mortgage given as part payment for the conveyance.

At the time or immediately following this conveyance, Lewis M. Hardy and his wife, Ella M. Hardy, executed a first mortgage to the Ogden State Bank for the sum of $3,200, and a second mortgage to Clarence P. Hardy for $7,500, and a third mortgage to Mary Jane Hardy, the mother of Lewis and Clarence, for the sum of $2,861.65. With the proceeds from the Ogden State Bank mortgage Lewis paid the Weston mortgage, some delinquent taxes and other expenses, paid to Clarence the sum of $2,000, and used the balance himself.

A short time before the conveyance of the farm to Lewis, Clarence had gone to California. The deed was sent to him for execution and acknowledgment there. The $2,000 was invested in Long Beach property with his brother-in-law and sister and subsequently lost. He was married in California in 1924 to a lady from Denver, Colo., by name Ada Thompson, Lothario-like giving his age as 26 when he was in fact 33. He moved to Denver in 1925 and lived there at the home of his mother-in-law till October, 1927, when he left for California by way of Ogden for the purpose of attempting to get some adjustment or settlement of property matters at both places. Apparently while upon his way from California to where he was living at Denver his condition was such that in September, 1928, upon an inquisition in the matter of his sanity had in Arizona, he was adjudged insane and committed to the Insane Asylum of

Arizona, where he remained at the time of the trial of this cause. The physician's certificate accompanying the transcript of his commitment concerning his mental condition in part said:

"The diagnosis in this case is that of Dementia Praecox of paranoid type, which I consider a chronic and incurable mental disease."

The record discloses that Clarence P. Hardy had been three times committed to mental hospitals; once in 1912, once in 1913 and recommitted, and once in 1928. From the time of his release in 1914 till the time of his last commitment in 1928, a period of approximately fourteen years elapsed, during all of which time he was at liberty attending to his own affairs, farming, entering into contracts, leases, making deeds, and buying, selling, and dealing in personal property as a normal individual similarly situated would have done.

The letters and documents introduced in evidence with the single exception of the one written from the hospital in Arizona, for a person with no more education than Clarence P. Hardy had, are well composed, the thread of thought is connected and sustained, and manifest a competent grasp of the subject matter discussed. It is true that most of the letters are remote in time from the execution of the deed, but those written from Denver, typed by his wife as testified to by her and which he signed, as would be expected, bear no marks of mental aberration of any sort. There are no documents or other evidence closely concurrent with the time of the execution of the deed.

It would be an interesting account to give, by way of summary, the testimony of the witnesses concerning some of the things done, the tendencies manifested, things that might be termed oddities or peculiarities as interpreted by witnesses. Such summary, except for the color given to it by witnesses on either side of the question, would not change materially the narrative heretofore made.

We are of the opinion there is not sufficient evidence in the record to support the finding that Clarence P. Hardy was an incompetent at the time of the execution of the deed attacked herein; but, on the contrary, we ▪ think the evidence establishes beyond controversy that he was clearly capable of understanding the situation and did so understand and appreciate the transaction. The deed is therefore a valid and subsisting conveyance and must be given that effect. Likewise the mortgage received by him as consideration for the deed is a valid document of which he became the owner at the time of its execution and delivery.

We are thus brought to the question of the release of the mortgage. There were alleged three grounds in the complaint attacking the validity of the release of the mortgage by Clarence P. Hardy, which release was dated the 14th day of December, 1926, and recorded exactly one month later. The first ground is that of incompetency of Clarence P. Hardy. That issue must be found against the plaintiff, and in favor of competency as heretofore indicated. The second ground is that the release was obtained by fraud. While there was some evidence, especially in the letters addressed to Clarence P. Hardy, making promises and representations that might have been considered by the court upon that subject, had there been either allegation in the complaint or findings of facts based upon the evidence submitted to support such findings, having heretofore indicated the insufficiency of the allegations purporting to charge fraud, and likewise the insufficiency of the findings, that ground must be eliminated from further discussion. The third and last ground, that of want of or failure of consideration, requires further examination.

At the time Lewis M. Hardy and his wife, Ella M. Hardy, conveyed the farm at Roy to J. Dwight Harding—all defendants herein—the farm was subject to a mortgage in the sum of $7,500 and other incumbrances not necessary to further identify as related to the release of the mortgage

in question. This $7,500 mortgage was executed by Lewis M. Hardy and wife to Clarence P. Hardy. The warranty deed of Lewis M. Hardy and wife to J. Dwight Harding, dated October 7, 1926, and recorded November 24, 1926, conveyed the property described and made it expressly subject to the mortgage of Clarence P. Hardy, also subject to the mortgage of Mary Jane Hardy. The mortgage of Mary Jane Hardy was paid by J. Dwight Harding and released after the Roy farm property was conveyed by Lewis M. Hardy and wife to J. Dwight Harding. After the release of the Clarence P. Hardy mortgage, J. Dwight Harding conveyed by warranty deed the Roy farm to Robert N. Hamblen. Plaintiff alleges that the release of the Clarence P. Hardy mortgage was obtained without consideration and by fraud. The fraud element has been disposed of.

The evidence intimates or suggests, rather than discloses, that there was some conversation or implied understanding between Lewis M. Hardy and J. Dwight Harding that the Clarence P. Hardy mortgage was to be released upon the Roy farm and shifted to the Ogden Valley property conveyed by Dr. Harding to Lewis M. Hardy. No such mortgage was ever executed. The record discloses that the negotiations concerning the trade between Lewis M. Hardy and Dr. J. Dwight Harding took place during the fall of 1926. As between Clarence P. Hardy and Lewis M. Hardy, the record discloses a letter from Clarence to Lewis dated at Denver, Colo., September 28, 1926, which contains the following statement bearing upon the land exchange:

"It seems to me that $30,000 is pretty steep for that place you are thinking of trading for. I don't see how you can assume that much. If you can get it for $28,000 I will release the mortgage, as I think a higher figure than that would be more than you could stand."

Lewis did not secure the suggested reduction in price. The sequence of events shows that the deed from Lewis M. Hardy and wife to J. Dwight Harding bears date the 7th of October, 1926, and was recorded November 24, 1926.

While the record does not show when the deed was made by Dr. Harding to Lewis M. Hardy for the Huntsville property, the exchange contract would presumptively call for a deed from Dr. Harding to Lewis M. Hardy at the same time.

The only claimed communication appearing in the record from Lewis M. Hardy to his brother, Clarence, relating to the transaction, is an unsigned purported copy of a telegram not proved to have been delivered which bears date at Ogden, Utah, October 9, 1926. It is addressed to C. P. Hardy, 45 West 33 avenue, Denver, Colo., and reads:

"Your mortgage will be the same as the one you have here. We cannot succeed here. It is up to you to permit the trade or take this place back. Which will you do, Taxes and interest will be unpaid here. Will have constant income on other place. Can pay mother and some to you annually. Will move at once. Telegraph answer Sunday."

By a letter dated at Ogden, Utah, November 18, 1926, Dr. Harding opens the subject of the trade in a general way to Clarence P. Hardy at Denver. The letter reads:

"Ogden, Utah, Nov. 18, 1926.
"Mr. Clarence Hardy,
    "Denver, Col.
"Dear Sir:
    "I am a total stranger to you and now that a deal has been consummated whereby the farm in Roy has been deeded to me and your brother Lewis has purchased my farm in Huntsville I am writing concerning your mortgage. Now I have not spent one hour with Lewis in all our conversation. I owned a fine farm, well equipped and well stocked and was proud of it—its buildings, its location, etc. One day Mr. Hinckley asked if I would sell it and I refused to give him any positive answer. Later I reconsidered it and he made me a proposition to sell it to Lewis Hardy and I investigated his moral, physical and spiritual life, and made him thru Mr. Hinckley a proposition, insisting that Lewis go and investigate and ask questions of the neighbors, the man who was employed to run it and if he was thoroughly satisfied I would make the offer. One time he spoke of getting you to turn your mortgage on the place he (Lewis) purchased, however this was not demanded when he went on the farm. Now I do

not need the cash, in fact I want it out earning interest and want it safe, therefore I made Lewis a long time offer—a reasonable rate of interest and I feel sure and confident he will win, as his cows and chickens, etc., will be ready cash every month and he can make a living on the side after he is once settled. Had I not believed this I would not have sold to him.

"Now I must come to the point. I have some offers for the old home in Roy—one offer is from Italians—the other from Japs. I have not sold yet but I may sell any day and shall sell subject to the Bank First Mortgage and subject to your second mortgage. These people are anxious to keep your mortgage on the place and I can dispose of it easier with your mortgage than I can without it. Now to be fair with you—once this place is sold you know these foreigners buy the first mortgage and then demand you buy it or close the second or forfeit it. This could be done and another way they would not surrender the second mortgage until it was due.

"Now I wanted to place this before you so you would not blame me. I want you to consider it and do as your best judgment prompts you. It will be all right with me. I expect to close the deal finally with Lewis soon, make out all the final papers and close the deal. I expect to close the deal on the old place soon (Hardy Place at Roy) and turn over everything as it is. With your mortgage it will sell for a little more and a little better than it would without the mortgage.

"Now in conclusion you may do as you think best either leave it on the old farm or you can place it on the farm Lewis is buying. In my opinion the latter is a safer and by far a better loan than where it is now. You will say that I am saying this because I want you to change it—not so. I am trying to co-operate with you and do what is right. I haven't spent 60 minutes on this deal—some little misunderstanding has crept out among some of the people—perhaps due to poor judgment on account Real Estate dealer or perhaps partly due to some misunderstanding on the part of some of your relatives.

"Hoping you do not misunderstand me and hoping you will write me and give me your opinion and I shall co-operate with you and try and help you, I am,

"Yours very respectfully,
"[Signed] J. Dwight Harding."

Without any reference to an answer, another letter, December 10, 1926, is sent to Clarence at Denver by Dr. Harding. It reads:

"Ogden, Utah, Dec. 10, 1926.

"Mr. Clarence P. Hardy,
 "Denver, Colorado.
"Dear Sir:
"Sometime ago I wrote you about sending the release for the mortgage to the 'State Bank of Ogden' and in exchange I would gladly turn over a mortgage properly executed to the Bank attending to this detail in person for you. Now I am closing the deal with Lewis about Tuesday of next week and selling my equity in the old Hardy Estate at Roy before the 20th of Dec. Should you desire your mortgage left where it is, kindly inform me, so there will be no misunderstand-(ing), as you can not release your mortgage after I once sell the equity.
"I do not want to be unfair, however I must act now and you are to undertsand that there is no underhand work or that I am selling my equity secretly, but giving you every chance to do what you think is the best.
"Kindly inform me at once concerning your attitude on this matter.
"Hoping you understand me and wishing you every success, I am,
 "Yours very respectfully,
 "[Signed] J. Dwight Harding."

On January 20, 1927, Dr. Harding acknowledges receipt of the release of Clarence P. Hardy's mortgage:

"Ogden, Utah, Jan. 20, 1927.

"Mr. Clarence P. Hardy,
 "Denver, Col.
"Dear Sir:
"Your release was duly received and placed of record, and I presumed all trouble was cleared away, until your mother was requested to sign her release and place same with Lewis and you. Mrs. Hardy was willing and would have signed had Arnold not interceded and later co-operated with Mrs. Fowles and other sisters. Now they forbid your mother to release and things are not cleared up. As soon as mother's release is received your mortgage on Huntsville property will be placed on record and forwarded to you.
"Of course your mortgage can be placed on record and suit entered at once to set your mother's mortgage aside as it is evident from my attorney's standpoint her mortgage is to secure interest on your mortgage once held on the Hardy place at Roy.
"I do not care to spend any more time on this deal if possible except to give you an opportunity to straighten things up at once.

Arnold does not seem to comprehend the condition and knows that your mother's interests are better in Huntsville with Lewis than in Roy, as she will loose all as soon as court sets her mortgage aside in as much as your mortgage is now released.

"Anticipating you will soon straighten this little affair out and let me hear from you by return mail I am,

"Respectfully,

"[Signed] J. Dwight Harding."

No other reference by letter is made to the transaction when the release of Clarence's mortgage was under discussion. On the witness stand some reference was made by Dr. Harding to some considerations about a new mortgage for Clarence, but whether such thought on their parts contemplated a mortgage by Lewis M. Hardy or J. Dwight Harding, or upon what property, is not made clear. It is, however, admitted by both of them that no such mortgage was ever executed, delivered, or recorded.

Reference is made in the exchange agreement between Lewis M. Hardy and J. Dwight Harding to this mortgage of Clarance P. Hardy and by the two plans set out in the contract different methods of handling that mortgage were incorporated in that agreement.

It is insufficient to say that J. Dwight Harding by the terms of the deed from Lewis M. Hardy expressly accepted the Hardy farm at Roy subject to the mortgage held by Clarence P. Hardy. It is likewise clear that no mortgage was ever given to Clarence as promised by Dr. Harding. It is likewise clear that Clarence P. Hardy was never paid anything by either Lewis M. Hardy or J. Dwight Harding for the mortgage release. Both of them so testified. Whatever the intention or understanding may have been as between Lewis M. Hardy and Dr. Harding as to Clarence getting any interest in the farm at Huntsville or a mortgage upon it in lieu of his $7,500 mortgage on the Hardy farm, no interest was ever conveyed to him. There is likewise nothing in the record from which it may in any sense be inferred that Clarence

P. Hardy intended to make a gift of this $7,500 mortgage to either Lewis M. Hardy or J. Dwight Harding, the beneficiaries of that release. Clearly if there was any promise or agreement to give Clarence a new or different mortgage, and the correspondence is clearly susceptible of such interpretation, that consideration wholly failed.

Such being the situation, and Lewis M. Hardy and Ella M. Hardy, his wife, and J. Dwight Harding being the beneficiaries thereof to the extent of the value of that mortgage, and it appearing to have been worth its face value plus any interest that had or may have accrued thereon, and that Clarence P. Hardy has been damaged to the same extent, the guardian of the plaintiff herein is entitled to a judgment against those parties for that amount.

The defendants Hamblen received the property from J. Dwight Harding with the record title free and clear of the mortgage incumbrance and, in so far as the record discloses, without any notice of fraud, or failure of consideration in relation to the release of the mortgage, and therefore stand in the place of innocent purchasers for value.

Giving all the weight that may be given to the effect of the insanity determinations and commitments and the other evidence adduced, we think the evidence not only fails to establish a case of incompetency at the time Clarence P. Hardy signed the deed and executed the release, but, on the contrary, clearly establishes his competency. It is to be remembered that it was nine years after he was released from the State Mental Hospital before the execution of the deed and nearly thirteen years before the execution of the release of the mortgage. During all of that period, having been released from the mental hospital, in so far as incompetency may be inferred from the commitment, competency may likewise be inferred from the release from the hospital. Clarence P. Hardy pursued his regular vocation, carried on his affairs in his own way,

interfered with no one any more, if as much, as the average normal person may have done under like or similar circumstances. He appeared, from the testimony of all who testified of having transacted any business with him, to be competent to understand, appreciate, and comprehend the nature of the transactions. On several occasions when relative values seem to have been involved, his judgment in so far as his own interests were concerned was better than that of his advisers or the parties with whom he was dealing. That he understood that he was either to have a new mortgage on or an interest in the Huntsville property in lieu of his release mortgage is scarcely open to question in the light of the record.

We are of the opinion that no good purpose could be served by remanding this case for a new trial. The evidence warrants a finding of the competency at the time the deed and release of mortgage set aside by the trial court were executed, and the trial court is directed to make findings, accordingly, that the release of the mortgage was obtained without consideration therefor and upon representations that tended to mislead. The reinstatement of the release of the mortgage would adversely affect the defendants Hamblin, and the court should enter judgment against Lewis M. Hardy and Ella M. Hardy, his wife, upon the same basis as would have to be made upon suit upon the note secured by the mortgage released; and the same judgment should be entered against J. Dwight Harding in favor of plaintiff as against his codefendants, Lewis M. Hardy and Ella M. Hardy. The error relating to the life estate of Mary Jane Hardy having by mesne conveyance become vested in Robert N. Hamblen, nothing further need be said thereon.

In view of the whole situation the judgment can better be formed and enforced by findings and judgment made and entered by the trial court, the findings of fact, conclusions of law, and the judgment should be modified to

conform to the views herein expressed and enforce the same so provided by law. *Johnson* v. *Seagull Inv. Co.,* 65 Utah 424, 237 P. 945.

The judgment of the trial court is reversed in the particulars herein set forth, and the cause remanded to the trial court to make findings and enter judgment in accordance with the views herein expressed. Each party to bear his own costs.

STRAUP, C. J., and ELIAS HANSEN, FOLLAND, and EPHRAIM HANSON, JJ., concur.